JASAKA COMPANY, Respondent,

v.

CITY OF ST. PAUL, Appellant,

Pritchard Tower Erection, Inc., Defendant.

Nos. 50317, 51759.

Supreme Court of Minnesota.

Aug. 14, 1981.

Edward P. Starr, City Atty., and Jerome J. Segal, Asst. City Atty., St. Paul, for appellant.

Briggs & Morgan, R. Scott Davies and Ronald Abrams, Minneapolis, for Jasaka Company.

OTIS, Justice.

This is the second appeal in this litigation. Earlier we remanded the case to give the City of St. Paul an opportunity to reconsider its denial of Jasaka Company's petition to vacate an unopened street. The City declined to act.

The district court, on August 5, 1980, confirmed its previous decision: (1) ordering Jasaka to remove its nearly completed radio tower, one leg of which encroaches upon a platted, unopened street; (2) ordering the City to reissue any permits necessary for Jasaka to rebuild the tower on property owned by Jasaka; (3) denying Jasaka's prayer for a finding that the City Council acted arbitrarily and capriciously in refusing to grant the petition to vacate a portion of the street; and (4) denying plaintiff Jasaka's motion for an order directing the City Council to vacate those sections of the street.

From that part of the order which directs the City to reissue a building permit, the City appeals and we reverse. The remainder of the order from which Jasaka cross appeals, deals with the refusal to vacate the street and directs removal of the tower leg. We affirm.

The parties have stipulated to the facts. On September 16, 1977, plaintiff Jasaka entered into an agreement with Motorola Communications and Electronics, Inc. (hereafter "Motorola") for the construction of a two-way communications tower. As subsequently modified, the agreement calls for the tower to be built on Jasaka's "North 200" property. The parties to the agreement understood that Motorola would lease the radio tower from Jasaka.

On October 4, 1977, an agent of Kroiss Investments (plaintiff Jasaka's predecessor of title to "North 200" and the originator of the plan to erect the tower) wrote to the Current Planning & Zoning Committee of St. Paul (hereafter "Planning Committee")

and requested a variance from zoning to allow for construction of the radio tower. The site proposed for the tower is zoned B–3, business district. The list of uses permitted in a B–3 zone does not mention radio towers. They are mentioned, however, on the list of uses permitted subject to special conditions in an I–1 industrial district zone.

The City Planner decided to treat the request not as one for a variance of zoning, but as one for a determination that the radio tower was a "similar use" to the mentioned uses permitted in a B–3 zone. The City of St. Paul zoning ordinance provides that: "The Planning Commission shall determine if a use is similar to other uses permitted in each district." St. Paul, Minn., Code § 62.113 (1981). Under section 60.542 of the zoning ordinance the uses permitted in a B–3 zone include: funeral homes, bus passenger and auto repair stations, used car salesrooms, machinery sales, "wholesale establishments, no outside storage," printing services, and manufacturing of small, precision goods. St. Paul, Minn., Code § 60.542 (1981). The zoning staff recommended denial of the application for "similar use" because: 1) radio towers are first mentioned as a special condition use in the "I–1" industrial district, 2) that in order to meet the special conditions in the I–1 district the proposed tower would need a site at least 330 feet square containing at least 2.5 acres, 3) the surrounding topography and the site's situation in relation to the railroad tracks is not conducive for development, and 4) the proposed development would be detrimental to the area. However, the Planning Committee's subcommittee recommended approval, and on October 28, 1977, the Committee adopted their recommendation.

On November 17, 1977, Jasaka petitioned the City to vacate portions of Arundel and Orange Streets adjacent to the "North 200" property on which the tower was to be built. Jasaka obtained title to the "North 200" property in January 1978. Inadequacies in the street vacation petition required Jasaka to file the petition a second time, in February 1978.

While the petition was pending, Jasaka sought on March 17, 1978, a building permit for the radio tower and filed a land survey of "North 200". Jasaka insists that it advised the building department of the proposed location of the tower northwest of an indoor roller skating rink that Jasaka intended to build on "North 200." The City contends that plaintiff made no such showing. On April 10, 1978, the City issued the building permit for the radio tower.

Soon thereafter, Motorola retained an Iowa subcontractor, Pritchard Tower Erection, Inc. to put up the tower. Construction began before the end of April 1978. However, according to Jasaka, Pritchard "became concerned with the reliability of the support for the concrete footings . . . and looking at the terrain there, where the tower is located, decided, with the help of an engineering firm, that the foundations for this tower would have to be changed." The City contends that the sandy soil condition and certain safety precautions were the chief concerns. In any event, Pritchard decided to pivot the location of the tower's legs, with the result that the northernmost leg encroached 15 feet upon the unopened portion of Orange Avenue. Pritchard apparently made that change on its own initiative and without Jasaka's consent.

On May 9, 1978, the City Council first became aware of the encroachment. Two days later the City Council ordered the construction to cease, and suspended the building permit pending a decision on the street vacation petition. The suspension was Jasaka's first notice of the encroachment. Construction halted with tower reaching upwards to 300 feet of the proposed 330 foot height. Jasaka had expended about $67,000 out of a construction budget of about $103,000 and was obligated by progress payments for much of the balance.

On June 20, 1978, the City Council decided against the recommendation of the City Valuation and Assessment Engineer and denied plaintiff Jasaka's street vacation petition. On June 28, 1978, the City revoked the building permit for the tower, and ordered Jasaka to remove the tower within 30

days of that date. Jasaka refused to comply with the order, and instead, initiated an action for declaratory judgment and named as defendants the City of St. Paul and Pritchard Tower Erection, Inc. Jasaka asked the district court (1) to declare that Jasaka has a vested right to complete construction of the tower; (2) to order the City to reissue the necessary permits to allow the tower to be completed; (3) to declare arbitrary and capricious the City's denial of the street vacation petition; (4) to order the City to vacate those portions of the street that were the subject of the petition, and (5) to order Pritchard to pay liquidated damages of $100,000 and unliquidated damages of over $50,000 for the negligent construction of the tower.

The court held that Jasaka had a vested right to build the tower on "North 200" and ordered the City to reissue the necessary permits, and to reconsider Jasaka's street vacation petitions. The court reserved the question of the removal of the tower from its encroaching location, and denied the other requests for relief. The court's order does not reveal whether the court thereby denied or had not yet considered Jasaka's claim against Pritchard for negligent construction.

Following an unsuccessful appeal to this court, the City Council, on January 23, 1980, reconsidered and reaffirmed its denial of the street vacation petition. On August 5, 1980, the district court reconfirmed its earlier order.

The appeals present three issues:

1. Did plaintiff Jasaka acquire a vested right to rebuild the radio tower on its "North 200" property?

2. If plaintiff Jasaka acquired that vested right, should the City Council be equitably estopped from refusing to reissue Jasaka's building permit?

3. Did the City act arbitrarily and capriciously in denying Jasaka's street vacation petitions, and if so, should the City be ordered to grant the petitions?

The City concedes that Jasaka expended a considerable sum prior to the revocation of the building permit, but contends that the building permit was invalid and thus Jasaka could not acquire a vested right. This raises two questions. Was the permit invalid? Can a vested right to build be acquired if the builder has innocently relied on an invalid permit?

The City points to the fact that had "North 200" been zoned I–1 or been varied to I–1, the proposed construction of the tower would have been impermissible by reason of nonconformance with a condition set by the Zoning Ordinance for radio towers. A radio tower "shall be located centrally on a continuous parcel having a dimension equal to the height of the tower measured from the base of said tower to all points on each property line." St. Paul, Minn., Code § 60.60.614(4)(a) (1981) 534(d)(i). The City calculates that for the proposed 330 foot tower to conform with that provision, Jasaka would have to own a parcel of land 660 feet square or 2.5 acres (and presumably place the tower at the center, rather than at the. northern boundary as occurred here). The City asserts, and Jasaka does not deny, that Jasaka's "North 200" property would not have satisfied this condition of I–1 zoning. The City persuasively argues that what would have been nonconformance with I–1 zoning conditions, cannot be in conformance with the more restrictive conditions of B–3 zoning.

Jasaka argues that the Planning Commission was really deciding a variance request and decided it wrongly despite its having changed that request into one for a radio tower to be regarded as a use similar to others permitted in a B–3 zone.

■ The City's position is dispositive. The building permit was invalid because it granted permission to construct, in a restricted B–3 zone, a radio tower that was not even in conformance with the less strict, "subject to special use" conditions of an I–1 industrial zone.

Under those circumstances, did Jasaka acquire a vested right to rebuild the tower on its own property? The City argues that Jasaka cannot acquire a vested right to

build in violation of the zoning laws if the building permit is revoked as soon as the error is discovered. In support, the City cites *State ex rel. Howard v. Village of Roseville*, 244 Minn. 343, 70 N.W.2d 404 (1955) that held "where a permit has been issued . . . under mistake of fact and contrary to zoning ordinances, it confers no privilege . . . and even though [the party] may have taken some action . . . with the incurrence of expenses, it may, nevertheless, be revoked." (244 Minn. at 350, 70 N.W.2d 404).

Jasaka replies that a vested right is acquired when in good faith a building permit is obtained even if it is issued by mistake, citing *Commonwealth v. Flynn*, 21 Pa. Cmwlth. 264, 344 A.2d 720 (1975).

We follow instead our recent decisions in *Ridgewood Development Co. v. State*, 294 N.W.2d 288 (1980) and *Hawkinson v. County of Itasca*, 304 Minn. 367, 231 N.W.2d 279 (1975). In *Ridgewood*, we set out the conditions which give rise to a vested right:

a right becomes vested when it has "arisen upon a contract, or transaction in the nature of a contract, authorized by statute and liabilities under that right have been so far determined that nothing remains to be done by the party asserting it * * *." *Yaeger v. Delano Granite Works*, 250 Minn. 303, 307, 84 N.W.2d 363, 366 (1957). Nevertheless, in zoning cases decided under this theory, we have held that the mere possession of a building permit, the incurring of some expense and the assumption of obligations preliminary to construction, such as excavation, create no vested right. *Kiges v. City of St. Paul*, 240 Minn. 522, 538, 62 N.W.2d 363, 373 (1953). Neither do expenditures associated with the acquisition of the property, the removal of trees, the grading of the land or excavation. *Hawkinson v. County of Itasca*, 304 Minn. 367, 374–77, 231 N.W.2d 279, 283–84 (1975).

294 N.W.2d at 294.

In *Hawkinson* we quoted with approval the view of the Iowa Supreme Court that "It is impossible to fix a definite percentage of the total cost which establishes vested rights. It depends on the type of project, its location, ultimate cost, and *principally the amount accomplished under conformity*." 304 Minn. at 376, 231 N.W.2d at 284 (emphasis added) (quoting *Board of Supervisors v. Paaske*, 250 Iowa 1293, 1300, 98 N.W.2d 827, 831 (1959)).

Jasaka's tower is nearly 90% completed. If the tower now stood wholly on Jasaka's property, and thus conformed with the terms of the permit, the rule developed in *Ridgewood* and *Hawkinson* might support a decision that Jasaka had acquired a vested right despite the invalidity of the building permit. Jasaka's tower, however, encroaches on an unopened public street; conforms neither with the terms of the permit nor with the zoning ordinances and by reason of its location adjacent to a "skatedium" poses an unusually serious threat to the safety of large numbers of patrons using that neighboring facility.

We note in passing that with rare exception a city is not estopped from denying the unlawful functions of its own officials. The proposed tower did not meet the requirements of either "I–1" zoning or the more restrictive "B–3" zoning. It was the duty of Jasaka to determine for itself the propriety of the proposed construction it undertook, and had it done so the most cursory inquiry would have disclosed the problems it now seeks to correct.

3. Finally, there is little evidence to support Jasaka's claim that the City acted arbitrarily in denying the street vacation petitions. Jasaka argues that because the City Council would not consider the petition without reference to its concern about the tower it acted unfairly. We find no impropriety in the City's considering the petitioner's proposed use before granting or denying the vacation of a public street. Indeed it would be derelict were it to do otherwise.

Affirmed in part and reversed in part.