TOWN OF GRANT, Respondent,

v.

WASHINGTON COUNTY, et al., Respondents,

Davis and Davis, Inc., Appellant.

No. 81–857.

Supreme Court of Minnesota.

May 28, 1982.

Stacker, Ravich & Simon, R. J. Tansey, Jr., and Lyman P. Q. Johnson, St. Paul, Lance J. Johnson, P. A., Inver Grove Heights, for appellant.

Eckberg, Lammers, Briggs & Wolff, Stillwater, for Town of Grant.

Douglas Swenson, Stillwater, for Washington County, et al.

SCOTT, Justice.

The Town of Grant appealed to the district court from an order of the Washington County Board of Adjustments and Appeals which, reversing a contrary decision by the County Planning Department, had directed the county zoning administrator to issue permits allowing Davis & Davis, Inc., owner of a 2.5 acre lot in the town, to construct a specially designed on-site sewage disposal system. The district court reversed that order after finding that there was not substantial evidence to support the Board's findings that the proposed system complied with the County Development Code and would not endanger public health, safety or welfare, and Davis & Davis appeals from the district court's order. Based on our independent review of the evidence submitted to the Board and to the district court, we reverse the court's order and direct issuance of the permits pursuant to the Board's decision.[1]

Appellant's lot is one in a subdivision of similar tracts, all zoned for single family residential use. Homes have been constructed on surrounding lots, and each owner has been permitted to construct an on-site sewage disposal system. There was evidence that installation of a municipal sewer system is not contemplated before the year 2000. The County Development Code contains the following regulations for on-site systems:

Section 402.09: The system shall consist of a building, a sewer, a septic tank and a soil absorption unit. The soil absorption unit shall consist of a subsurface

---

1. A transcript of the hearings held before the Board and the documentary evidence presented to it was furnished to the district court, as also were prior applications for permits which had been filed with the County Planning Department, data supporting those applications, and the Planning Department's denials of the requested permits. The parties stipulated to this record without direction or participation by the court, and the record was clearly adequate for purposes of review. *Cf., Honn v. City of Coon Rapids*, 313 N.W.2d 409 (Minn.1981).

disposal field. All sewage shall be treated in the septic tank and the septic tank effluent shall be discharged to the disposal field. The septic tank drain field system shall be considered the only acceptable system for installation unless it can be demonstrated that this system is not feasible on the particular lot in question and if it can be demonstrated that the system being provided as an alternative will not create a pollution problem.

Section 405.05(1): In areas of shallow groundwater, the depth of the water table shall be determined. No soil absorption system shall be installed in an area where the water table is at any time less than 6½ feet below ground level or 4 feet below the bottom of the drain field trench. Soil absorption systems installed in areas where impermeable layers are found at depths of less than 6½ feet shall be considered to be of special design.

The conventional septic tank drain field system authorized by section 409.09 was installed on other lots in the vicinity of appellant's property. It is undisputed, however, that the nature of the subsoil on appellant's lot does not permit use of that system.

The lot, which slopes from a hill in the northeast corner to a low area in the southwest corner, has an 18-inch top layer of silty clay, beneath which lies a clay layer 5 to 6 feet thick; beneath that layer is a bed of gravel which extends to and beneath a water table 22 feet below the earth's surface. Soil borings also showed the presence of water in the clay layer within a few feet of the surface, and percolation tests established that water drains through the gravel at the rate of 1 inch every 5 minutes but drains through the clay layer at a rate of 1 inch per 480 minutes. State and county standards require a percolation rate of less than 1 inch every 60 minutes for use of a conventional septic tank drain field system. Additionally, during 3 or 4 months of the year, the amount of snow melt and rain is sufficient to saturate the clay layer and in the past few years has caused ponding of surface water in the low area of the lot. Although the parties differ on whether the saturated water conditions create an additional water table, and appellant has also urged that the clay layer is not "impermeable," it concedes that the subsoil conditions require a specially designed alternative system, which is permitted by section 402.09 provided that appellant demonstrates that the alternative system "will not create a pollution problem."

In October 1979 appellant made an application for the necessary permits to construct an alternative system which calls for two drain field trenches to be dug through the clay layer to the sand layer beneath it. Since the clay through which the trenches would be dug does not permit sufficiently rapid drainage, the trenches themselves would be filled with sand. This alternative system, first proposed by appellant in October 1977, was then rejected by the Planning Department following consultation by Lyle Doerr, a county building official, with Martin Ziebell of the United States Soil Conservation Service and Dr. Roger Machmeier of the University of Minnesota, the latter a professional and agricultural engineer with considerable expertise in on-site sewage treatment systems. These experts had agreed that the concept of extending trenches through the clay to underlying soil had not been substantiated by research and ignored some aspects of on-site waste treatment and disposal. In October 1979 appellant again applied for the necessary permits to construct essentially the same type of system. Mr. Doerr again consulted Ziebell and Dr. Machmeier and also consulted Michael Hansel, a staff engineer of the Pollution Control Agency, about this system. These experts agreed that the design did not meet the requirements of the County Development Code, and the Planning Department then denied the application.

Following appellant's appeal to the County Board of Adjustments and Appeals, that Board held two hearings. At the first, held February 2, 1980, David C. Briggs, the registered engineer who had designed the proposed alternative system, told the Board that the problems posed by the slowness of the drainage through the clay layer on the lot were eliminated by extending the drain field trenches through the clay to the sand below it and by filling the trenches them-

selves with sand. He expressed the opinion that the system would work exactly as a conventional septic tank drainage field system does. He also said that Mr. Hansel had approved the concept of deep trenches but had been concerned about whether the soil adjacent to the trenches could become saturated and be attracted into them, resulting in overloading of the system. To meet this objection Briggs proposed to modify his design to include an interceptor trench on a slope above the drain field to divert surface water from the drain field trenches. He represented that Hansel had discussed this design modification with him and had agreed that it would in theory solve the concern he had expressed. Doerr and other Planning Department employees told the Board that the experts consulted by the Planning Department had expressed the opinions that the proposed system could become hydraulically overloaded and might not provide adequate treatment. They also said that these experts had had no opportunity to consider the effect of the proposed design modification to include an interceptor trench. In order to obtain that review and to permit these experts to appear, the Board held a second hearing on April 22, 1980.

At that hearing appellant presented as a witness a hydrologist with Briggs' firm, Terry Huntrods. Huntrods, who had prepared a "saturated soil flow analysis" and a "down slope flow analysis," expressed the opinions that the interceptor trench would prevent all surface water above it from reaching the drain field and that water from snow or rain falling directly on the drain field would drain through the drain field trenches rapidly enough to prevent the drain field itself from becoming saturated. He concurred with Briggs that the specially designed system would effectively treat waste, would not become hydraulically overloaded, and presented no threat to the environment. These conclusions were challenged by the Planning Department's official, Doerr, by Dr. Machmeier, and by Mr. Hansel. Dr. Machmeier, with whom the others agreed, expressed doubt that the proposed system would function properly. He said that if fine particles of soil migrat-

ed into the drain field trenches, they would slow drainage through them and that the biomatt which ordinarily develops and spreads on the sand at the bottom of the trenches would act also as a valve slowing drainage through the sand. Consequently, he disputed Huntrods' analyses of flow rate, although Dr. Machmeier conceded that the interceptor trench would cut off lateral flow of water into the drain field trenches unless the interceptor itself became plugged by fine materials. The experts presented by the Planning Department felt that it was essential that the drain field trenches remain in an unsaturated condition to insure adequate treatment of the sewage and said that the effect of digging such trenches through clay and filling them with a different soil was difficult to determine. Dr. Machmeier said that the migration of fine particles into the drain field trenches, if it occurred, could eventually create a tighter soil, reducing the time in which liquids could drain through it, and possibly could even seal the trenches. He thought also that the biomatt, essential for adequate treatment, could be impaired or destroyed if the finer soils washed down the trenches. Doerr and Hansel also agreed that the interceptor trench, if it functioned properly, would cut off lateral flow of water into the drain field trenches, but like Dr. Machmeier raised the possibility that the interceptor itself could become plugged by fine particles. Dr. Machmeier, who explained these concerns most fully, admitted that he did not know whether they would be realized. He recommended that the interceptor not be dug into the clay layer and also that draintile be laid at the bottom of the interceptor and returned to the edge of the slope in order to drain water and decrease migration of fine materials. Doerr and Hansel concurred in these recommendations.

At the conclusion of the second hearing, the Board, by votes of two to one, decided to require that appellant modify the proposed system to incorporate Dr. Machmeier's recommendations and any others forthcoming in a reasonable time and then voted to direct issuance of the permits necessary to construct the system as modified.

On the Town's appeal, the district court found, contrary to the Board of Appeals' findings, that there was a water table on the property within 6½ feet of the ground level. The district court determined also that there was not substantial evidence in the record to support the Board's finding that the alternative system complied with the Washington County Development Code and its finding that the system as designed did not present a danger to the public health, safety or welfare.

 We are required to make an independent review of the Board's decision. *Northwestern College v. City of Arden Hills*, 281 N.W.2d 865 (Minn.1979). In doing so, we recognize first of all that a court in reviewing decisions of this nature is not to substitute its judgment for that of the body created by the legislature to perform that function. In reviewing the decision granting the requested permits, our inquiry should focus on whether the proposed use is contrary to the general welfare as already established in the County Development Code. *Honn v. City of Coon Rapids*, 313 N.W.2d 409 (Minn.1981). But the standard of review remains whether on the evidence before it, the Board reached a reasonable decision. We are compelled to conclude that it did so on the basis of the opinions of appellant's experts, who were convinced that the proposed system was feasible and also would protect the environment.

These opinions, although countered by opinions to the contrary, in our view furnish substantial evidentiary support for the Board's findings that the proposed system was in harmony with the County Development Code (including the requirement set forth in section 402.09 that appellant demonstrate that "the system being proposed as an alternative will not create a pollution problem") and that the system does not present a danger to the public health, safety or welfare. Admittedly, appellant cannot furnish evidence of successful experience because a similar system has never been employed, but its designer and the

hydrologist, both qualified by education and experience, expressed the stated opinions. While the witnesses appearing for the Planning Department raised the possibilities that the system might not provide adequate treatment of sewage and that it could become hydraulically overloaded, with potentially serious consequences, these experts could not say with any certainty that their concerns would ever be realized. It was the function of the Board to determine which of the expert opinions to accept, and since those expressed by appellant's witnesses furnish substantial support for the Board's findings, we are compelled to conclude that the trial court erred in setting them aside.[2]

Reversed.

WAHL, Justice (dissenting).

An independent review of the decision of the County Board of Adjustments and Appeals leads me to conclude that the district court properly determined that the Board's findings that the proposed system complied with the County's Development Code and that the zoning administrator's denial of the Davis application had been inappropriate were not supported by substantial evidence in the record as a whole.

The trial court concluded that the applicant's system is an alternative specially designed system; that, pursuant to section 402.09 of the Washington County Development Code, applicant's proposed system on the property must have been demonstrated not to create a pollution problem prior to any approval of the alternate system; and that there was not substantial evidence in the record submitted to support the finding that the alternate system approved would not create any pollution problem or present a danger to the public health, safety or welfare. These conclusions were compelled.

The soil-boring tests of the lot in question showed water within a few feet of the surface, and applicant's own experts admitted that the soil is saturated from April

---

**2.** It seems clear that the Board had less expertise than the expert witnesses. Nevertheless, the record illustrates that the Board's members had a comprehension of the issues which in our

view justifies the presumption that its decision was correct. *See Crookston Cattle Co. v. Minn. Dept. of Natural Resources*, 300 N.W.2d 769 (Minn.1980).

through June. The water table is thus such that the use of a soil-absorption system is prohibited by Development Code § 405.-05(1) unless it be one "considered to be of special design."

The proposed system, being one of special design, must comply with Development Code § 402.09. Section 402.09 provides, in relevant part, that an alternative to a septic tank drain field system can be used only "if it can be demonstrated" that it "will not create a pollution problem." The system proposed here is experimental and has never been tried. Its effect cannot be demonstrated by evidence of successful experience. Applicant's witnesses expressed their belief that it will work satisfactorily, and they theorized that it will have the capacity to accept whatever amount of water would enter it during the times that the soil above the drainfield was saturated. They did not "guarantee" the success of the system. The validity of the analyses furnished by Huntrods to prove the ability of the system to accept such water was disputed by Dr. Machmeier, whose academic qualifications and experience were considerably more extensive than those of applicant's experts. Neither Machmeier, Hansel, nor Doerr were satisfied that the proposed system was adequate. While they conceded that their concerns might not be realized, they questioned whether hydraulic overloading of the system would occur and also whether the development of the biomatt necessary for adequate treatment would be destroyed or impaired by entry of fine particles into the trenches.

The record thus suggests that no witness could state with assurance that the proposed system would or would not function satisfactorily. The requirement that a property owner demonstrate that his proposed alternative system would not cause pollution reflects a legislative determination that the public welfare requires such proof even if it means that the property cannot be devoted to the use for which it was zoned. The opinions of the designers of the system, not backed by experience, research, nor accepted theoretical analysis, are insufficient basis for a reasonable inference that pollution would not occur. The

Board's findings, based on such an inference, do not have substantial evidentiary support.

I would affirm.