Timothy S. YEH, et al., Respondents,

v.

COUNTY OF CASS, State of Minnesota, Respondent,

Gullview Association, Inc., Defendant,

Gullview Associates, LLP, Individually and doing business as Gullview Resort, Appellant.

No. A04–1454.

Court of Appeals of Minnesota.

May 17, 2005.

John H. Erickson, Erickson, Pearson & Aanes, Brainerd, MN, for respondents Yeh and Kirklin.

Paul D. Reuvers, Jason J. Kuboushek, Iverson Reuvers, LLC, Bloomington, MN, for respondent Cass County.

Eric J. Magnuson, Peter Gray, Rider Bennett LLP, Minneapolis, MN, for appellants Gullview Assoc. et al.

Paul J. Sandelin, Sandelin Law Office, Pequot Lakes, MN, for appellants Gullview Assoc. et al.

Considered and decided by MINGE, Presiding Judge; WRIGHT, Judge; and PORITSKY, Judge.

## OPINION

PORITSKY, Judge.*

This appeal arises from a dispute over the Cass County Environmental Services Department's (ESD) issuance of building permits to appellant-developer Gullview LLP for construction of three cabins on the property of the former Gullview Resort (Gullview), and from appellant-developer's installation of docking space for 18 boats at Gullview. The district court reversed a pair of decisions made by the Cass County Board of Adjustment (BOA), which would have allowed appellant to continue construction on the three cabins and to retain its current docking system.

On appeal, appellant-developer argues that (1) the BOA's decision is not *per se* arbitrary and capricious; (2) the district court's ruling is inconsistent with *Town of Grant v. Washington County*, 319 N.W.2d 713 (Minn.1982), and thus, should be reversed; (3) the district court should not have construed Cass County's Shoreland Ordinance and, in any event, construed it wrongly; (4) the BOA's decision to withhold judgment on the docking issue was not arbitrary and capricious and, even if it was, Cass County should be estopped from ordering removal of the docks; (5) appellant-developer's request for approval of its docking system was automatically approved under Minn.Stat. § 15.99 (2002)[1]; (6) appellant-developer's completion of substantial construction before the revocation of the permits gave it a vested interest in the construction; and (7) the district court erred in dismissing appellant-developer's cross-claim against the county.

## FACTS

Appellant purchased the former Gullview Resort in 1999.[2] At the time, Gullview consisted of eight cabins, an owner's residence, and three docks that could accommodate 22 to 30 boats. Under the Cass County Shoreland Ordinance, the former Gullview Resort was considered a commercial use. Appellant subsequently applied for a conditional use permit to develop Gullview and two neighboring lots

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

1. Minn.Stat. 15.99 was amended in the 2003 legislative session; the amendment took effect June 1, 2003, "for requests submitted on or after that date." 2003 Minn. Laws ch. 41, § 2. At the time the relevant events took place, the 2002 version of the statute was in effect. Because statutes are not to be construed retroactively unless the legislature clearly indicates, Minn.Stat. § 645.21 (2004), the issue is governed by the 2002 version of section 15.99.

2. When the underlying property is referenced, we will refer to it throughout this opinion as "Gullview." And, when referring to Gullview LLP or its managing partner, Thomas Steffens, we will use "appellant."

into a residential planned unit development (PUD) with 21 units. But appellant withdrew its application at some point in late 1999, after conferring with Cass County's Environmental Services Department (ESD).

In January 2000, appellant submitted an application for a commercial PUD, consisting of 14 units on the former Gullview property only. And on January 13, 2000, the Cass County Planning Advisory Commission (PAC) voted to deny appellant's application because it did not satisfy certain criteria in Cass County's Shoreland Ordinance.

On July 25, 2000, appellant submitted a preliminary site plan to Paul Fairbanks (Fairbanks) of the ESD, showing the addition of 6 new cabins on the Gullview property. The additional cabins were to be located in "Tier 1," "Tier 2," and "Tier 3" of the property—the "Tier" designation referring to their proximity to the shore of Gull Lake. Appellant planned for 6 "Tier 1" cabins (3 original and 3 new), 6 "Tier 2" cabins (5 original and 1 new), and 2 "Tier 3" cabins (both new). Appellant submitted construction and sewage permit applications for all 14 units on October 26, 2000. The sewage permits were issued on December 5, 2000.

On June 13, 2001, appellant submitted applications for building permits for units 9, 10, and 11 (all in Tier 1) to the ESD. And on July 5, 2001, appellant submitted building permit applications for units 12 (Tier 2), 13, and 14 (both in Tier 3). The ESD issued building permits for units 9 and 10 only on July 12, 2001.

On each building permit application, appellant checked the box labeled "Resort cabin, RV, mobile home," which is located under the "Commercial" category-heading. Because the previous use of Gullview Resort was a resort, if appellant's use were in fact a resort, appellant's PUD would not

be a conversion, and appellant would be allowed to proceed "over-the-counter," without a public hearing.

Meanwhile, on July 20, 2001, a cooperative, Gullview Association, was formed, which acquired ownership of Gullview. On July 31, 2001, appellant-developer submitted a check to Cass County for Gullview's 2001 lodging license. And the sale of individual cabins began in August 2001.

On August 2, 2001, appellant sent a letter to Fairbanks of the ESD. The letter states, "[i]n accordance with our discussion of today, I am providing you with this information to document the basis upon which I have been proceeding with the installation of new infrastructure and obtaining building permits for the Gullview Resort." Appellant's letter outlines the analysis of the Shoreland Ordinance that led to its self-determination that it should be classified as a resort, and states, in conclusion,

> [t]his is not a conversion of the resort to a residential planned unit development; no land is being reclassified to the residential use category. Gullview will continue to operate as a resort, with individuals who will own each unit in the resort and have their units rented through the resort association's manager.

In an apparent response to Fairbanks' request for a legal opinion, the Cass County Attorney's office issued a letter to Fairbanks on September 10, 2001. The letter states, in relevant part:

> I had earlier reviewed the materials you provided my office and had concluded that the addition of five (5) new units at the Gull View Resort does not require additional platting procedures, etc. under Shoreland Ordinance Section 9.2 which allows for the expansion of an existing PUD with six (6) or less new dwellings [sic] units to expand providing

the project does not exceed the allowable densities as provided by the ordinance. Gull View Resort as an existing resort is an existing commercial PUD. The organization of the Gull View Resort is a community interest community under Minn.Stat. § Chap. 515B and in no way changes this status because said organization qualifies as a "cooperative."

The ESD subsequently issued the remaining building permits—for units 11, 12, 13, and 14—on November 16, 2001.

The record indicates that, after the issuance of the remaining building permits and during the construction of the new units, opposition from surrounding landowners mounted, as did pressure on Fairbanks and the ESD regarding Gullview's status as a "resort." Appellant sent Fairbanks a letter on May 13, 2002, stating:

> As you know, Gullview Resort has a license to operate as a resort for the year 2002 season. At the present time, Gullview has four units available for rental, one efficiency unit (Unit No. 4) and three 3–bedroom units (Unit Nos. 1, 5, and 11). Our understanding of the Cass County Ordinance is that in order to be considered as a resort, Gullview must maintain a minimum of three units available for rental.

> Gullview's resort rental season will run from Saturday, June 1, 2002 through Saturday August 31, 2002. Gullview's resort guests will be solicited via Gullview's website and through inquiries made through the Brainerd Chamber of Commerce, which is our principle source of reservation.

Appellant's letter also included Gullview's Association Bylaws and an example of the Proprietary Lease executed by each member of the Association.

Appellant asserts that, amidst the increasing pressure on the ESD regarding Gullview's "resort" status, Fairbanks orally agreed to the installation of new docks at Gullview—providing space for 18 boats—based on the fact that the former Gullview Resort had dock space for 22 boats. Appellant installed the new docks on May 4, 2002. And on June 5, 2002, appellant sent a letter to Fairbanks stating, "[i]t was represented to me at the time of sale that the docks could handle 22 average size boats. We have now completed the installation of eighteen slips on two docks and have reduced the docking/slip capacity of the resort, rather than increasing it."

On June 8, 2002, Fairbanks sent a letter to appellant revoking the building permits for units 12, 13, and 14, and reducing the number of allowable dock spaces. The letter states, in relevant part:

> As we discussed last year, an existing resort is allowed to expand by up to six units provided that the density for such expansion is available. The expansion I approved was done with the understanding that the expansion was to be part of an upgrade of Gullview Resort. The assumption on my part was the individual resort cabins would be available to the public on a short time basis, be it for a summer season, a week, a month, or a night for that matter.

> However, the more I observe the marketing efforts directed at selling the units, rental is an after thought at best.... The chances of owners renting their obviously luxurious, well designed, and well constructed homes is slim at best.

Fairbanks stated further that "[t]he permits for the units in tier three are null and void," and "[s]ix units, including the office will be allowed in tier two," but "[t]hree of the units will be for rental use only." Regarding the docking situation, Fairbanks stated that "[e]ach unit will be allowed a

slip for one watercraft. The rental units will be allowed one slip for three watercraft. The rental slips will be for day use only. Trailer in and trailer out."

Appellant and appellant's counsel responded to Fairbanks by letters dated July 8, 2002, and indicated an intent to appeal the ESD's decision to the Cass County BOA. Appellant's counsel also apparently met with Fairbanks and an assistant county attorney in late July. And, on August 1, 2002, appellant's counsel sent a letter to the same assistant county attorney stating, "[a]s I understand it . . . Paul Fairbanks would like you to review the information [appellant] and I indicated we would provide in advance of the Board of Adjustment hearing, for purposes of resolving the appeal." The letter also asserts that "[g]iven the information that is and has been provided, there can be no other conclusion than Gullview Resort meets the definition of a resort pursuant to the Ordinance," and that "revocation of or a refusal to issue the remaining permits can only be viewed as an arbitrary action of the County."

In response, the assistant county attorney issued a letter to Fairbanks on August 9, 2002. The letter states, in relevant part:

> I have reviewed materials sent to me by [appellant], which are to be provided to the Cass County Board of Adjustment at its appeal hearing. . . . Said documents indicate the Gull View Resort operations with four units offered for rental are: advertised on the internet at www.gullview.com and that Gull View is a member of the Brainerd Chamber of Commerce as a source of rentals. . . . It would appear that under the definition provided by the Shoreland Ordinance at Section 3.0, Gull View Resort is in fact a resort. While it may appear from advertising materials, etc. that there is an intent to sell residential premises and that this is the weight of the endeavor as opposed to rental to transients, the fact remains that Gull View Resort meets the definition of the resort as provided by our ordinance.

Based on the county attorney's opinion, the ESD reinstated the building permits for units 12, 13, and 14, and agreed to allow the new docks to remain. The permits were formally reinstated on October 14, 2002.

On November 9, 2002, respondents Yeh and Kirklin (respondents) appealed the ESD's decision to the Cass County BOA. And on December 9, 2002, the BOA heard their appeal.

At the hearing, respondents stated that "[c]ommercial or residential PUD is the key here. It's—the question really is not whether it's a resort or not, because resort is a label that can be hung on anything. The question is whether it's commercial or residential in character." Respondents also asserted that, as a result of appellant's use of the "resort" designation,

> there is a conversion occurring with respect to the former Gullview Resort which must be a conversion done pursuant to a residential planned unit development conditional use permit process, allowing the public to participate in the decision making rather than as is the case now, in effect, an end run being done—attempted—by over-the-counter permits being issued by the planning administrator.

Respondents submitted a lengthy appendix, which the BOA acknowledged receiving. And respondents recapped the history of appellant's attempts at rezoning the property, including the various exchanges described above. Respondents also pointed out that, despite appellant's claims, "[t]here haven't been any renters for the past couple of years." Finally, respon-

dents argued that because there are five units in Tier 1 at Gullview, docking for only five boats should be allowed under the Shoreland Ordinance, section 9.64.

A representative from the Department of Natural Resources (DNR) also testified that Gullview appeared to be a residential development. He stated, "I guess the bottom line is we feel that [appellants] should have gone through the conditional use process, and one of the end results of that process would have been a restriction in the number of dock units . . . to the number of units in the first tier."

Respondent–Kirklin presented a series of pictures to the BOA, and described the former Gullview Resort and its docks, versus the current Gullview entity and its docks.

Appellant then began its argument with a question: "Is it a resort, or isn't it a resort?" And appellant stated, while "it may appear from advertisement materials, et cetera . . . that there is an intent to sell residential premises and that this is the way that they endeavor as opposed to rental to transients. . . . The fact remains that Gullview Resort meets the definition of the resort as provided by the ordinance." Appellant also noted that "[t]he docking . . . is a side issue. . . . The ultimate issue here is whether or not this is a resort." And appellant asserted that the BOA must "stick with what the county attorney's office is telling Mr. Fairbanks, and that is it's a resort." Finally, appellant argued that Gullview was operating as a resort—he stated that "[r]enters of units will be allowed a boat slip, and there will be housekeeping services provided. There will be on-site management. There is a lodging license." And he stated, in conclusion, "[y]ou can try to pretend that it's something other than a resort, but it is a resort, because it meets the criteria that are laid out in your ordinances."

After hearing a number of other arguments similar to those noted above, three BOA-members spoke. The first member stated:

> I think what they have done to this piece of property is pretty despicable, and it's what we thought would happen. . . . I think the appropriate voice for this to be resolved is in a court of law. I don't really think that this board is in the best position to do that. I believe that [Fairbanks] acted as best he could with the advice that he had from the county attorney. And also that we must keep in mind that our legal advisor is also the county attorney. And so therefore, I don't see that we really have any choice at this point but to uphold [Fairbanks'] decision.

The BOA's chairman concurred and stated:

> I have to agree with Sue here. I do believe if I was in [Fairbanks'] position I would have done the same thing. Because my attorney would have advised me I made a mistake. But there seems to be so many other questions beyond that right now that I feel that this probably should end up in a court of law. We are not lawyers sitting up here. We're far from it. From what I've heard today, though, I do think that it has to be done in a court of law, the rest of this. Now there is a question of whether it's commercial or residential PUD, or whether it's a resort. It's still up in the air. I think the thing that we're here today for, one thing is to uphold or deny . . . what [Fairbanks'] done here.

The third and final BOA-speaker stated the following:

> This is going to wind up in court one way or the other. We can't even decide what's a resort here. As far as I'm concerned, I haven't got any good definition of a resort yet. I don't know if

there is one. That seems to be a big question here.

The BOA then made a motion to uphold Fairbanks' most recent decision regarding the building permits, and the motion was carried. With regard to the dock issue, the chairman stated:

> I don't think we're capable up here of answering that question. I think we're—a court of law will have to make a decision one way or the other on this. I don't like to see it, but unfortunately I can't—I couldn't rule on this anyway, because ... we would have to go to court anyway on one way or the other on this....

Finally, a motion was made that the BOA "not make a decision" on the dock issue, as well as on the issue of whether this case should be "reheard as a residential PUD." The motion carried.

The BOA subsequently issued written minutes for the December 9, 2002 session. After a brief summary of the arguments, and without making any findings of fact, the BOA's minutes state:

> MS/P Mesch/Wold/Unanimous to uphold the ESD Director's decision to reinstate the revoked permits for Units 12, 13, and 14 as based upon the opinion from the County Attorney's Office to the ESD Director dated 8/6/02.

> MS/P Sundberg/Mesch/Unanimous to take no position as to the slip/dockage and the request to refer the project to the PAC as a residential planned unit development based on the lack of specific reference to either issue in the letter to the ESD Director from the County Attorney's Office dated 8/6/02.

Respondents subsequently filed suit in the Cass County District Court against appellant and Cass County. The district court reversed the BOA's decision in its Order dated April 14, 2004, and entered

judgment for respondents on May 13, 2004. On July 13, 2004, the district court entered its Order dismissing appellant's cross-claims against Cass County. This appeal followed.

## ISSUES

1. Did the district court err in concluding that the Board of Adjustment acted arbitrarily and capriciously in upholding the Environmental Service Department's decision to reinstate Gullview's building permits?

2. Did the district court err in its determination that Gullview is a residential rather than a commercial PUD under the terms of Cass County's Shoreland Ordinance?

3. Did the district court err in concluding that the Board of Adjustment acted arbitrarily and capriciously in withholding judgment on the Environmental Service Department's decision approving Gullview's planned dock configuration?

4. Should Cass County be estopped from ordering the removal of the docking system now in place at Gullview?

5. Did Gullview acquire vested rights in construction of Units 12, 13, and 14, and in its dock installation by virtue of the Environmental Service Department's prior grant of appropriate permits?

6. Did the district court err in dismissing Gullview's cross-claims against Cass County?

## ANALYSIS

### I.

### 1. Standard of Review

▮▮▮ Both parties devote significant effort to arguments regarding the standard of review here. But it is clear that the standard of review to be applied to the

BOA's determination is whether, on the evidence before it, the BOA made a reasonable decision. *Town of Grant v. Washington County,* 319 N.W.2d 713, 717 (Minn.1982); *see also Mohler v. City of St. Louis Park,* 643 N.W.2d 623, 630 (Minn. App.2002) (same), *review denied* (Minn. July 16, 2002). And this court is required to review the BOA's decision independent of the findings and conclusions of the district court. *Town of Grant,* 319 N.W.2d at 717 (citing *Northwestern College v. City of Arden Hills,* 281 N.W.2d 865, 868 (Minn. 1979)).

That said, this court's reasonableness inquiry must be tempered by a substantial degree of deference. The supreme court has held that courts reviewing decisions of this nature are not to substitute their judgment for that of the decision-making body, *VanLandschoot v. City of Mendota Heights,* 336 N.W.2d 503, 509 (Minn.1983), and that "[t]he court's authority to interfere in the management of municipal affairs is, and should be, limited and sparingly invoked." *White Bear Docking & Storage, Inc. v. City of White Bear Lake,* 324 N.W.2d 174, 175 (Minn.1982). Accordingly, with this degree of deference in mind, and based upon an independent examination of the record, we must determine whether the BOA's affirmance of the ESD's grant of building permits to appellant was reasonable. *See VanLandschoot,* 336 N.W.2d at 509.

## 2. Reasonableness of BOA's action

■ Appellant first argues that the BOA's failure to issue findings of fact is not *per se* arbitrary and capricious as found by the district court. Appellant points to the BOA's "stated reason" for its decision—that it was relying solely on the advice of the county attorney—in support of the proposition that the BOA's decision was not *per se* arbitrary and capricious.

But we disagree with appellant's assertion that the BOA "did exactly what was required of it by statute."

It is correct, as appellant argues, that the only requirement explicitly set forth in section 394.27 is that "[t]he reasons for the board's decision shall be stated in writing." Minn.Stat. § 394.27, subd. 6 (2002). But the BOA is a creature of statute, vested with authority to "hear and decide appeals from and review any order, requirement, decision, or determination made by any administrative official charged with enforcing any ordinance." Minn.Stat. § 394.27, subd. 5 (2002). We read this grant of authority to carry with it a duty to make and decide appeals in a reasonable manner. *See VanLandschoot,* 336 N.W.2d at 508. In light of this requirement of reasonableness, we conclude that the range of acceptable conduct allowed BOA's is not as great as appellants would have it.

Here, the members of the BOA who spoke at the hearing indicated an unwillingness to decide this case based on their own analyses. *See Swanson v. City of Bloomington,* 421 N.W.2d 307, 312–13 (Minn.1988) (stating "that a district court should establish the scope and conduct of its review of a municipality's zoning decision by considering the nature, fairness and adequacy of the proceeding at the local level and the adequacy of the factual and decisional record of the local proceeding"). In fact, all three BOA members who spoke expressed their belief that this was a matter "for the court" to decide. Also, while appellant contends that the BOA's reliance on the county attorney's recommendation should hold some legal force, it appears from the record that this reliance was borne out of a desire by the BOA to have the courts rule on the issue, rather than out of a belief that the county attorney's interpretation of the Shoreland Ordinance was the correct one. Accord-

ingly, we find that the action of the BOA here cannot be deemed reasonable and, thus, we affirm the district court's decision.

### 3. The district court's finding that there is a "lack of any rationale for the BOA's decision"

Appellant also argues that the district court erred in finding that there is a "lack of any rationale for the BOA's decision." But appellant's argument here ignores this court's duty to determine the reasonableness of the BOA's action based on the record below, without deference to the district court's findings. *See VanLandschoot,* 336 N.W.2d at 509. As stated above, we have concluded that the BOA's action was not reasonable, and, while appellant may dispute the technical reasons for the district court's analogous findings, this argument bears little weight here.

### 4. Appellant's reliance on *Town of Grant*

Appellant argues further that the supreme court's decision in *Town of Grant* should have precluded the district court from reversing the BOA's decision here. In *Town of Grant,* a district court reversed Washington County's BOA on appeal, and substituted its own conclusions regarding expert opinions on the viability of a sewage disposal system, for the conclusions of the BOA. 319 N.W.2d at 717. The supreme court eventually reversed the district court's decision, stating:

> The standard of review remains whether on the evidence before it, the Board reached a reasonable decision. We are compelled to conclude that it did so on the basis of the opinions of appellant's experts, who were convinced that the proposed system was feasible and also would protect the environment.

These opinions, although countered by opinions to the contrary, in our view furnish substantial evidentiary support for the Board's findings. . . . It was the function of the Board to determine which of the expert opinions to accept, and since those expressed by appellant's witnesses furnish substantial support for the Board's findings, we are compelled to conclude that the trial court erred in setting them aside.

*Id.* Appellant relies on this language for the proposition that the BOA here relied on expert findings, but this reliance is misguided. The supreme court, in *Town of Grant,* describes a BOA hearing where both sides presented expert factual testimony and the BOA, while admittedly not an expert on the subject, chose one side and issued a decision in reliance on that side's experts. The district court then reversed the BOA's decision, substituted its own judgment for that of the BOA, and ruled in favor of the opposite side. The situation here is distinguishable.

Here, the members of the BOA who spoke at the hearing stated that they did not feel comfortable making a decision and that such a decision should be made by a court of law. There is also no indication in the BOA's written decision that any of the evidence presented was even considered. The issue before the BOA was an issue of law, as opposed to the factual dispute resolved by the board in *Grant.* The expert (an assistant Cass County attorney) on whom the BOA relied did not attend the hearing and was not subject to cross-examination. We further note that the assistant county attorney, in drafting his letter, relied only on material submitted by appellants and by appellant's counsel. Thus, it is clear that here, unlike the case in *Town of Grant*—where a district court reversed the BOA's judgment regarding conflicting expert testimony and substituted its own— this court is faced with a BOA that failed

to consider any evidence and was determined not to pass judgment on the issues. The procedure followed by the BOA here is so far removed from the procedure followed in *Town of Grant* that *Grant* is of no help to appellant on this issue.

## II.

■ Appellant, while maintaining its argument that the district court had no right to construe the provisions of the Shoreland Ordinance, argues alternatively that the court erred when it construed the ordinance and concluded that Gullview is a residential development.

As we have noted, before appellant acquired Gullview Resort, the property was a commercial use. At issue here is whether, under the Shoreland Ordinance, Gullview is a commercial PUD, or whether it is a residential PUD as the district court determined. Given that different consequences result from whichever definition applies, Gullview cannot be both a commercial and residential PUD. That is, if it is a commercial PUD, the Shoreland Ordinance would allow it to proceed with its construction plans without a public review process. *See* Shoreland Ordinance 9.2 ("Planned unit developments must be processed as a conditional use, except that an expansion to an existing commercial PUD involving six (6) or less new dwelling units or sites ... can be a permitted use"). But if Gullview is a residential PUD, then it is subject to public oversight. *See* Shoreland Ordinance 9.7. Appellant styled the project as a "resort," and thus a commercial PUD, and proceeded "over-the-counter" without public review.

■ In cases where the interpretation of an ordinance is at issue, this court looks to the ordinance itself to determine whether a governmental entity's decision was unreasonable or arbitrary and capricious. *White Bear Docking & Storage, Inc.,* 324

N.W.2d at 176. And "where the question is whether an ordinance is applicable to certain facts, the determination of those facts is for the governmental authority, but the manner of applying the ordinance to the facts is for the court." *Frank's Nursery Sales, Inc. v. City of Roseville,* 295 N.W.2d 604, 608 (Minn.1980).

The Shoreland Ordinance defines a "resort" as:

any building, structures, or enclosures kept, used, maintained or advertised as, or held out to the public to be an enclosure where sleeping accommodations are furnished to the public and primarily to those seeking recreation, for periods of one day, one week or longer, and *having for rent three or more cottages, rooms, or enclosures.*

(Emphasis added.) The ordinance states that a "commercial PUD" means:

Uses that provide transient, short-term lodging spaces, rooms or parcels with operations that are essentially service oriented. These shall include but not be limited to hotel/motel, bed and breakfast accommodations, resorts, recreational vehicle and camping parks, and other primarily service oriented activities.

And the ordinance defines a "residential PUD" as:

A use where the nature of residency is non-transient and *the major or primary focus* of the development is not service-oriented. For example, residential apartments, manufactured home parks, time-share condominiums, townhouses, cooperatives and full fee ownership residences would be considered as residential planned unit developments. To qualify as a residential planned unit development, a development must contain at least five dwelling units or sites.

(Emphasis added.)

Appellant points to the definition of "resort" and argues that because, at all times,

three cabins have been available for rental by the public, it is a "resort" under the Shoreland Ordinance.[3] Therefore, appellant goes on to argue, because the commercial PUD definition states that it "shall include ... resorts," the district court erred in concluding that the Gullview is a residential development. We disagree.

■■■ Appellant's argument requires us to consider the definition of "resort" in a vacuum, ignoring other provisions in the ordinance. But "[t]he rules that govern the construction of statutes are applicable to the construction of ordinances," *Smith v. Barry*, 219 Minn. 182, 187, 17 N.W.2d 324, 327 (1944), and "a statute is to be construed as a whole so as to harmonize and give effect to all its parts." *Id.; see also Van Asperen v. Darling Olds, Inc.*, 254 Minn. 62, 74, 93 N.W.2d 690, 698 (1958) (different provisions of the same statute must be interpreted in light of each other).

A clear distinction between a commercial and a residential PUD exists in the first sentence of each definition. A commercial PUD means "[u]ses that provide transient, short-term lodging spaces, rooms or parcels with operations that are essentially service oriented." But a residential PUD means "[a] use where the nature of residency is non-transient and the major focus of the development is not service-oriented."

Here, Fairbanks, in his June 8, 2002, letter to appellant, said,

> the expansion I approved was done with the understanding that the expansion was to be part of an upgrade of Gullview Resort. The assumption on my part was the individual cabins would be avail-

able to the public on a short time basis,.... However, the more I observe the marketing efforts directed at selling the units, rental is an after thought at best.

Moreover, even the assistant Cass County attorney, in concluding that Gullview met the definition of a resort, observed that, "[w]hile it may appear from advertising materials, etc., that there is an intent to sell residential premises and that *this is the weight of the endeavor* as opposed to rental transients ..." (emphasis added). The county attorney's observation about "the weight of the endeavor" is supported not only by the advertising materials, etc., but also by the simple fact that out of the 14 units, three are to be available for rental, leaving 11 to be occupied by residents.

Finally, we note that the interpretation espoused by appellant would lead to an absurd result. *See Wegener v. Comm'r of Revenue*, 505 N.W.2d 612, 617 (Minn.1993) (rejecting statutory construction leading to absurd result). At oral argument, appellant's counsel was asked if its argument would hold true even where fifty new residences were constructed, so long as at least three were advertised for rental. Appellant's counsel responded that, under Cass County's Shoreland Ordinance, it would. This example, while distinguishable from the case at hand, where there are fourteen residences with at least three available for rental, demonstrates the absurdity of appellant's position: Under appellant's reasoning, even if a development had 100 units with three for rental to vacationers and 97 units occupied by

---

**3.** As evidence of its resort-oriented activities appellant cites: (1) procurement of a resort license, (2) the advertisement of Gullview as a resort on the internet at www.gullview.com, (3) Gullview's membership with the Brainerd Chamber of Commerce as a source of rentals, and (4) Gullview's Bylaws and Proprietary Lease, both of which provide permission for its owners to rent their respective cabins.

homeowners, we would still be obliged to call the entire operation "a resort."

We conclude that Gullview is a residential development within the meaning of the Cass County Shoreland Ordinance. Because Gullview was previously a commercial resort, and appellant's PUD is residential, appellant is not entitled to proceed over-the-counter and without public oversight. *See Mohler*, 643· N.W.2d at 634 (finding that the city issued a building permit in violation of its ordinances and directing "the city to take action to enforce the terms of the city's ordinance").

## III.

**Did the district court err when it limited the number of boat slips appellant could install?**

Appellant argues that (1) the BOA's decision to withhold judgment on the dock issue was reasonable; (2) the proposed docking system is allowed by section 9.64 of the Shoreland Ordinance; and (3) when the ESD failed to act on appellant's request for approval of its docking system within 60 days, the ESD automatically approved the request by operation of Minn. Stat. § 15.99 (2002). Accordingly, appellant argues, the district court erred when it limited the number of boat slips appellant could install.

### 1. Was the BOA's decision to withhold judgment on the dock issue reasonable?

■ As noted above, the BOA is granted the authority to "hear and decide appeals from and review any order, requirement, decision, or determination made by any administrative official charged with enforcing any ordinance . . . ." Minn.Stat. § 394.27, subd. 5. With this grant comes the parallel responsibility to exercise that authority. Thus a complete abdication of

its decision-making authority is not a reasonable action. *See White Bear Docking & Storage, Inc.*, 324 N.W.2d at 176 (stating that "[t]he setting aside of routine municipal decisions should be reserved for those rare instances in which the City's decision has no rational basis").

■ Appellant argues that the BOA simply relied on an expert (the assistant county attorney) by refusing to make a decision on the dock issue, and this reliance is supported by the supreme court's decision in *Town of Grant*. But this argument is belied both by our analysis above and by the record. The three BOA members who spoke at the December 9, 2002 hearing stated in some form or fashion that the issues before them should be decided by a court of law. But they nonetheless affirmed the conduct of the ESD and Fairbanks by stating that they too would have relied on the county attorney's opinion, without any further consideration of the factual or legal issues involved.

It is hard not to sympathize with persons untrained in the law who are required decide legal issues such as those in this case, but the duties imposed by law on the BOA require decisions that are reasonable. We have concluded that the BOA's decision to affirm the ESD was unreasonable. We conclude that the BOA's act in not ruling on the issue of dock expansion is likewise unreasonable.

### 2. Appellant's reliance on Section 9.64 of the Shoreland Ordinance

■ Appellant also argues that Gullview's dock expansion is allowed by section 9.64 of the Shoreland Ordinance. Section 9.64 provides:

The number of spaces provided for continuous beaching, mooring, or docking of watercraft must not exceed one for each allowable dwelling unit or site· in the first tier *(notwithstanding existing*

*mooring sites in an existing commercially used harbor).*

(Emphasis added.) Appellant argues that it fits the exception because the original Gullview Resort had dock space for at least 20 boats. Therefore, appellant reasons, installation of dock space for 18 boats is permissible under section 9.64, because the docks are "existing mooring sites in an existing commercially used harbor" and are thus excepted from the "one space for each dwelling in the first tier" rule. But this argument is premised on the idea that Gullview fits within the definition of a "commercial PUD" under the Shoreland Ordinance. And, as stated above, we have concluded that Gullview is a residential PUD. Accordingly, appellant's arguments on this issue are without merit.

### 3. Automatic approval under Minn. Stat. § 15.99

Appellant also argues that, under Minn. Stat. § 15.99 (2002), appellant's request for approval of its docking system was automatically approved when the ESD failed to deny its request within 60 days. *See* Minn.Stat. § 15.99, subd. 2 (stating that "an agency must approve or deny within 60 days a written request relating to zoning ... or other governmental approval of an action" and "[f]ailure ... to deny a request within 60 days is approval of the request."). Appellant contends that requests were made on July 8, 2002, when appellant and appellant's counsel wrote letters to Fairbanks, serving as a notice of appeal and outlining the nature of the appeal, and on August 14, 2002, when appellant wrote a letter to Fairbanks confirming that the ESD would allow dock space for 18 boats.

■ Cass County argues that appellant did not make this argument to the district court and therefore this court should refuse to address it under the rule stated in

*Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn. 1988). As appellant notes in its reply brief to this court, this argument was raised in its Answer and Cross-claim, dated September 22, 2003. Accordingly, this issue is properly raised on appeal.

■ Cass County also argues that appellant did not make an appropriate "request" under Minn.Stat. § 15.99, and, accordingly, appellant's argument on this issue is without merit. Appellant's July 8, 2002 letter to Fairbanks states in the first paragraph that

[t]his letter, and the enclosed letter ... from Gullview Resort, shall serve as notice of appeal to the Cass County Board of Adjustment of your decision outlined in your letter ... dated June 8, 2002.... The enclosed letter ... outlines a partial summary of the nature of the appeal.... According to the Cass County [Shoreland] Ordinance ... the [BOA] shall hear appeals from the decision of the [ESD].

In that letter, there is no request that Fairbanks approve Gullview's proposed docking system. Accordingly, we conclude that, rather than a "written request" for "governmental approval of an action" under Minn.Stat. § 15.99, subd. 2, the July 8 letters were notices of appeal. Thus, the July 8, 2002, correspondence to Fairbanks did not start the 60–day period under Minn.Stat. § 15.99.

■ Appellant argues further that the August 14, 2002 letter is a "request" under Minn.Stat. § 15.99. This letter begins, "[t]his is to confirm our telephone conversation ... wherein you advised me that the permits ... are to be reissued in accordance with the director [sic] of the County Attorney." It further states, "[a]lso with respect to the docks, this will confirm that you indicated that based upon the Affidavits I provided you ... related to the dock usage are satisfactory and you

have agreed to allow the existing docks ... to remain in place." This letter is also not a request for approval, as it simply confirms a prior telephone conversation.

We conclude that none of the letters was a request that started the 60–day period under Minn.Stat. § 15.99, subd. 2. Given the decisive effect of section 15.99, we are not inclined to expand its operation beyond its clear meaning to include notices of appeal and letters confirming telephone conversations. Accordingly, we reject appellant's arguments on this issue.

## IV.

 Appellant argues that, even if this court rejects its other arguments, Cass County should be estopped from requiring that the docking system now in place be removed. Where justice demands, estoppel may be applied against a local government exercising its zoning powers. *Ridgewood Dev. Co. v. State,* 294 N.W.2d 288, 292 (Minn.1980); *see also Mesaba Aviation Div. v. County of Itasca,* 258 N.W.2d 877, 880 (Minn.1977). "[E]stoppel is available as a defense against the government if the government's wrongful conduct threatens to work a serious injustice and if the public's interest would not be unduly damaged by the imposition of estoppel." *Ridgewood,* 294 N.W.2d at 293 (quoting *United States v. Lazy FC Ranch,* 481 F.2d 985, 989 (9th Cir.1973)). But if there is no wrongful conduct by the government, this court's inquiry should stop. *Id.*

 In our view, Cass County did not act wrongfully. Initially, the county, through Fairbanks, agreed to allow appellant to install new docks, but it did so on appellant's representation that the new development would allow Gullview remain as a commercial PUD. When it appeared to Fairbanks that the development was not as appellant had represented it, he re-

duced the number of docking spaces that he had earlier approved. By this time, appellant had already installed the docks.

The county's reversal of its position on the docks was due to appellant's representation that Gullview would remain a commercial PUD. Given that Gullview was in reality a conversion into a residential PUD, and appellant's representations misled the county, appellant cannot be heard to say that the county acted wrongfully. Nor can we say that justice requires the imposition of equitable estoppel in favor of appellant. And, ultimately, if the county acts under a final judicial order directing appellant to remove the docks, the county will merely be enforcing its own ordinance. It is well settled that a "municipality cannot be estopped from correctly enforcing [an] ordinance even if the property owner relied to his detriment on prior city action." *Mohler,* 643 N.W.2d at 638 (quoting *Frank's Nursery,* 295 N.W.2d at 607). As such, appellant's estoppel argument is without merit.

## V.

 Appellant next argues that, because substantial construction on units 12, 13, and 14 had been completed and the new docking system had been installed by the time the ESD revoked appellant's building permits and reduced the number of docks allowed, it acquired a vested right to maintain the buildings and docks. The vested rights doctrine in Minnesota developed to deal with state control over private development through the use of zoning provisions and building permits. *Ridgewood,* 294 N.W.2d at 294; *see also Hawkinson v. County of Itasca,* 304 Minn. 367, 231 N.W.2d 279 (1975). And, in a vested rights analysis, "the court asks whether a developer has progressed sufficiently with his construction to acquire a vested right

to complete it." *Ridgewood,* 294 N.W.2d at 294. A right is vested when:

It has arisen upon a contract, or transaction in the nature of a contract, authorized by statute and liabilities under that right have been so far determined that nothing remains to be done by the party asserting it.

*Stotts v. Wright County,* 478 N.W.2d 802, 805 (Minn.App.1991), quoting *Jasaka Co., v. City of St. Paul,* 309 N.W.2d 40, 44 (Minn.1981) (*review denied* (Minn. Feb. 11, 1992)). "In zoning cases, the 'contract' is the issuance of a building permit, issued in error or later revoked for some reason." *Id.*

 But the doctrine of vested rights exists to protect developers from changes in zoning laws aimed at frustrating development. *See Naegele Outdoor Adver. Co. of Minneapolis v. City of Lakeville,* 532 N.W.2d 249, 254 (Minn.App.1995) (holding that, where appellant did not submit permit application until four years after the ordinance in question was amended, appellant had no vested rights), *review denied* (Minn. July 20, 1995). And "[a] property owner is charged with knowledge of whether a local zoning ordinance permits construction undertaken on the property." *Stotts,* 478 N.W.2d at 805.

 Here, appellant argues that—no matter what the outcome of the analysis of its classification as a commercial PUD and its actions based on that classification—it now has a vested right to units 12, 13, and 14 and the docks, based on Cass County's prior grants of building permits and approval of the docking system.

But it is clear from the record that, whether in error or not, Cass County granted appellant approval to expand a *resort;* it did not approve development of a new residential neighborhood. We note that it was appellant who, on each building

permit application for Gullview, checked the box labeled "Resort cabin, RV, mobile home." This box is located under the "Commercial" category-heading on Cass County's building permit application form. And, as the ESD's Fairbanks aptly stated,

As we discussed last year, an existing resort is allowed to expand by up to six units provided that the density for such expansion is available. The expansion I approved was done with the understanding that the expansion was to be part of an upgrade of Gullview Resort.

Accordingly, we find the doctrine of vested rights inapplicable here. *See Stotts,* 478 N.W.2d at 805 (stating that "the county issued a permit to repair and remodel the boathouse. It did not issue a permit to build a new building, so Stotts cannot have acquired a vested right to retain his building.").

**VI.**

 Appellant's final claim is that the district court erred in dismissing its damages cross-claim against Cass County. Appellant argues that Cass County's actions here are analogous to those of the City of Minneapolis in *Snyder v. City of Minneapolis,* 441 N.W.2d 781 (Minn.1989), and, thus, the district court's decision was in error. But appellant's argument ignores this court's decision in *Mohler.*

In *Mohler,* this court analyzed a case with a fact-pattern and legal issues similar to those in the present case. The Mohlers sued their neighbors (the Christiansons) and the City of St. Louis Park after the city granted the Christiansons a building permit to construct a two-story garage, and later granted them a variance for the garage. The Christiansons filed a cross-claim against the city, alleging that the city incorrectly measured the garage, claiming the city should be estopped from requiring them to change the structure,

and asking for damages for the city's negligent misrepresentation of its zoning ordinance. The district court granted the city's summary judgment motion as to the Christianson's cross-claims, and the Christianson's appealed, arguing that their situation fell under "the narrow exception carved out in *Snyder.*" *Mohler*, 643 N.W.2d at 638. This court, in distinguishing *Snyder*, stated:

> The supreme court carved out a "narrow exception" to the rule of discretionary immunity ... and concluded that damages could be recovered in that case because the city's policy against using publicly dedicated parking to satisfy the ordinance's off-street parking requirement was an unwritten policy, and thus, the party to whom the permit was issued could not be charged with the knowledge of the illegal nature of his proposed land use.... Unlike *Snyder*, the ordinance in this case was written; it was signed by the mayor, the city clerk, and the city manager.

*Id.* It is undisputed that, here, the Shoreland Ordinance in question was both written and validly created. Accordingly, there is no reason to distinguish this court's ruling in *Mohler*, and we affirm the district court's dismissal of appellant's cross-claims against Cass County.

## DECISION

We conclude that the Cass County Board of Adjustment's decisions were not reasonable. We affirm the district court's finding that, under the terms of Cass County's Shoreland Ordinance, Gullview is a residential, rather than a commercial, PUD. And we find no merit in appellant's arguments that Cass County automatically approved its request for docking space under Minn.Stat. § 15.99 (2002); that Cass County should be estopped from ordering the removal of appellant's current docking system; and that the doctrine of vested

rights should apply here. Finally, we affirm the district court's dismissal of appellant's cross-claim against Cass County in accordance with our decision in *Mohler v. City of St. Louis Park*, 643 N.W.2d 623 (Minn.App.2002), *review denied* (July 16, 2002).

**Affirmed.**