EAGLE LAKE OF BECKER COUNTY
LAKE ASSOCIATION, Relator,

v.

BECKER COUNTY BOARD
OF COMMISSIONERS,
et al., Respondents,

Bruce Jacobs, et al., Respondents.

No. A07–112.

Court of Appeals of Minnesota.

Sept. 18, 2007.

James P. Peters, Karna M. Peters, Peters & Peters, PLC, Glenwood, MN, for relator.

Scott T. Anderson, Ratwik, Roszak & Maloney, P.A., Minneapolis, MN, for respondents Becker County and its Board of Commissioners.

Tami L. Norgard, Vogel Law Firm, Fargo, ND, for respondents Bruce and Barbara Jacobs.

Considered and decided by WRIGHT, Presiding Judge; MINGE, Judge; and WORKE, Judge.

## OPINION

MINGE, Judge.

In this certiorari appeal, relator Eagle Lake of Becker County Lake Association (ELA) challenges the decision by respondent Becker County and its board of commissioners (the county) to approve a conditional use permit (CUP) that would allow respondents Bruce and Barb Jacobs (the Jacobs) to create a recreational-vehicle (RV) campground. Because we conclude that the county has the authority to consider CUP applications pursuant to the zoning ordinance existing at the time of the application and did not abuse its discretion in making its determination under that ordinance, we affirm that exercise of the county's authority. But because the county did not have a specific site plan for the actual CUP being considered, as required by the ordinance, we reverse and remand.

## FACTS

ELA is dedicated to advancing and promoting the interests of property owners on Eagle Lake in Becker County. The Jacobs own land that includes substantial shoreline on Eagle Lake, where they pas-

ture cattle. In May 2004, the Jacobs submitted an application for a CUP to Becker County to convert a portion of an existing pasture, which includes shoreline of Eagle Lake, into a seasonal RV campground known as Blue's Valley Campground (the project). The zoning ordinance that was in effect on May 2004, allowed such a conditional use with 46 sites on the property.[1]

County consideration of the Jacobs's CUP application began in the summer of 2004. Opposition to the application, the requirement of an environmental assessment worksheet (EAW), and various proceedings delayed action. Meanwhile, in September 2004, the county began a public review of its land-use ordinances, and placed a moratorium on certain types of shoreland development. In late 2004, the Jacobs asked the county whether the ordinance existing when they made their application or a more restrictive proposed ordinance under consideration would apply to their project. In January 2005, Becker County, consistent with what a county board member said was the county's usual policy, informed the Jacobs by letter that because "the [CUP] application was submitted for review and accepted by Becker County on May 21, 2004, the application will be reviewed in accordance with the zoning ordinance in effect on that date." File notes made by a county employee indicated that the Jacobs were also advised that if they modified the project they would need to submit a new application for evaluation.

In March 2005, the county amended its zoning ordinance and created a new section that controls multi-unit-residential developments in shoreland areas. Becker County, Minn., Zoning Ordinance § 7A (2005). The new section 7A would limit the RV sites on the project parcel to about 29.

In May 2005, the county board ordered an environmental impact statement (EIS) on the project. In response to that order, the Jacobs adjusted their project and submitted a second EAW. The changes included the following: (1) additional open space, (2) new locations for septic systems, (3) relocation of many RV sites away from the shoreline, and (4) 54 RV sites. The county considered the changes, along with the new EAW, and issued notice of its intent to withdraw its order requiring an EIS.

In October 2006, the county's planning commission considered Jacobs's CUP application. The commission tabled the application to first determine which version of the zoning ordinance applied. The Becker County attorney issued a letter indicating that the application should be considered pursuant to the newly amended ordinance, unless the Jacobs had a "vested right" or some form of estoppel applied. The planning commission held a public hearing on November 21, 2006. The planning commission decided to apply the earlier 2002 version of the ordinance because, as one member stated, "[T]he Board has usually used the ordinance that was in effect at the time of the application." Then, under the version of the ordinance that was in effect at the time of the CUP application, the planning commission determined that the modified 54–site project was not acceptable and recommended that the county board "approve a conditional use permit for 46 RV sites, 18 boat slips, [and] a conservation easement buffer...." No site plan for the recommended 46–unit

---

1. The Becker County Zoning Ordinance in effect when the Jacobs submitted their CUP application was adopted in 2002. The ordinance was reenacted, but apparently not substantively altered, in November 2004. *See* Becker County, Minn., Zoning Ordinance § 26 (2004).

development was filed. On November 28, 2006, the board adopted the commission's recommendation and, on the basis of the ordinance in effect when the application was filed, granted the CUP for a 46–unit project. ELA then filed this certiorari appeal.

## ISSUES

I. Did Becker County have the authority to consider the Jacobs's application for a conditional use permit pursuant to its zoning ordinance as it existed at the time of the application?

II. Did Becker County abuse its discretion in granting the conditional use under the former ordinance?

III. Did Becker County err in granting a conditional use permit without a site plan for the project on file?

## ANALYSIS

### I.

 The first issue is whether the county has the authority to grant the CUP under the zoning ordinance as it existed at the time the Jacobs filed their application instead of the amended version of the ordinance that was in effect when the county approved the permit. The interpretation of an ordinance is a question of law for the court, which we review de novo. *Billy Graham Evangelistic Ass'n v. City of Minneapolis*, 667 N.W.2d 117, 122 (Minn. 2003); *Frank's Nursery Sales, Inc. v. City of Roseville*, 295 N.W.2d 604, 608 (Minn. 1980). "Ordinances are construed according to the recognized principles of statutory construction." *Chanhassen Estates Residents Ass'n v. City of Chanhassen*, 342 N.W.2d 335, 339 n. 3 (Minn.1984). "When interpreting a statute, we first look to see whether the statute's language, on its face, is clear or ambiguous. A statute

is only ambiguous when the language therein is subject to more than one reasonable interpretation." *Am. Family Ins. Group v. Schroedl*, 616 N.W.2d 273, 277 (Minn.2000) (citations omitted). At the same time, appellate courts' "authority to interfere in the management of municipal affairs is, and should be, limited and sparingly invoked." *White Bear Docking & Storage, Inc. v. City of White Bear Lake*, 324 N.W.2d 174, 175 (Minn.1982).

Minnesota counties are empowered to engage in land-use planning and zoning. Minn.Stat. § 394.21, subd. 1 (2006). Generally, counties' official land-use controls, including designating certain land-development activities as conditional uses for which a CUP is required, are to be established by ordinance. Minn.Stat. §§ 394.24, subd. 1, 394.301, subd. 1 (2006). It is undisputed that the development of an RV park may be designated as a conditional use for which a CUP is required.

 Counties may amend their ordinances and change the status of conditional uses. Minn.Stat. §§ 394.25, subd. 10, 394.301, subd. 3 (2006). The record presented to this court does not specifically address the effective date of the 2005 amendment of the zoning ordinance. Generally, as long as the provisions of a zoning ordinance are not incompatible with the state law and are supported by a rational basis related to promoting the public health, safety, morals or general welfare; counties have broad legislative discretion regarding the content of the ordinances. *See Honn v. City of Coon Rapids*, 313 N.W.2d 409, 414–15 (Minn.1981).

At all times relevant to this controversy, Becker County has had a comprehensive zoning ordinance. The ordinance in effect when the Jacobs filed their application for a CUP was enacted in 2002. This ordinance was reenacted without substantial alterations in November 2004. *See* Becker

County, Minn., Zoning Ordiance § 26 (2004). Becker County amended section 7 of its zoning ordinance in March 2005, and section 7A now governs shoreland-multi-unit developments, including RV sites such as the Jacobs's, that can be leased for more than 28 days. Becker County, Minn., Zoning Ordinance § 7A, subd. 1 (2005). The ordinance, as amended in 2005, establishes more restrictive requirements for unit density and open space. *Id.,* subds. 4, 5 (2005). No reported Minnesota appellate decision or statute addresses whether a local unit of government, in considering an application for a conditional use permit, has discretion to apply the zoning ordinance that was in effect when that application was filed, even though the ordinance was changed before action was taken. Here, the 2005 amendment that added section 7A to the county's zoning ordinance does not state whether it is applicable to pending permit requests.

Several questions have been raised and bear on the propriety of using the 2002 zoning ordinance, in effect in 2004 when Jacobs applied for the CUP, as contrasted to the ordinance in effect in 2006 when the county took final action on that CUP request. We consider those issues in turn.

## A. Retroactivity Generally Under the Zoning Ordinance

■ ELA asserts that the Becker County zoning ordinance required the county to apply the 2005 amendment, which added section 7A, immediately to all pending land-use questions. ELA points to section 3, subdivision 2, of the ordinance, which states that "[a]fter the effective date of this Ordinance the use of all property and every structure ... erected, altered, added to or relocated in Becker County shall conform with this Ordinance." Becker County, Minn., Zoning Ordinance § 3, subd. 2 (2004). The record shows that this

general provision existed at the time of the 2002 and 2004 reenactments of the zoning ordinance.

Here, the Jacobs began their CUP application process in May 2004. County officials accepted the application and began public consideration of the application in June 2004. In September 2004, the county publicly began reviewing its land-use controls and imposed a moratorium on certain types of development. In 2005, the amendment to the zoning ordinance took effect. In November 2006, the county finally acted on the Jacobs's CUP application. Although the Becker County zoning ordinance applies to all land-use decisions, none of the language of the 2002, 2004, or 2005 versions of the ordinance clearly requires the county to apply the new, currently effective version of the ordinance in considering CUP applications that were submitted, accepted, and being considered under the previous version of the ordinance.

We conclude that the language relied on by ELA in section 3, subdivision 2 of the zoning ordinance is best read as a boilerplate requirement that Becker County zoning controls generally apply to all land-use questions, not as limiting the discretion of the county board regarding the question before us.

## B. Use of the Adjudicatory Process

■ The parties disagree (1) whether the county's decision to apply its then-existing 2002 zoning ordinance to pending applications was properly made in a judicial-type proceeding; and (2) whether this court reviews that decision as an adjudicatory decision by the county or whether we use the narrower, more deferential standard applicable to review of a legislative-type determination. The decision to make policy, including rules or regulations, is generally a part of the agency's quasi-

legislative power. *Kmart Corp. v. County of Stearns,* 710 N.W.2d 761, 770 (Minn. 2006). When reviewing legislative and zoning determinations, we consider whether the local unit of government has acted within the constitution and consistent with the statutory mandate and whether there is a reasonable basis for the decision. *See In re Appeal of Brine,* 460 N.W.2d 53, 54 (Minn.1990); *Honn,* 313 N.W.2d at 417.

■ Although no reported Minnesota cases have directly addressed the discretion of administrative agencies or local units of government to formulate policy rules in the adjudicatory process, federal law provides some guidance. As the Supreme Court has indicated, the line between the legislative and judicial functions of an agency "is not always a clear one and in fact the two functions merge at many points." *N.L.R.B. v. Wyman–Gordon Co.,* 394 U.S. 759, 770, 89 S.Ct. 1426, 1432, 22 L.Ed.2d 709 (1969). For example, when "exercising its quasi-judicial function an agency must frequently decide controversies on the basis of new doctrines, not theretofore applied to a specific problem, though drawn to be sure from broader principles reflecting the purposes of the statutes involved and from the rules invoked in dealing with related problems." *Id.* at 770–71, 89 S.Ct. at 1432. An administrative agency's exercise of the adjudicative function to evolve a policy on a case-by-case basis, even if it is not yet embodied in a legislative rule, is well recognized. *See Sec. & Exch. Comm'n v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947). "[A]djudicated cases may and do serve as vehicles for the formulation of agency policies, which are applied and announced therein, and . . . such cases generally provide a guide to action that the agency may be expected to take in future cases." *N.L.R.B. v. Bell Aerospace Co. Div. of Textron, Inc.,* 416

U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974) (quotation omitted). And regardless of whether policies or standards are specifically spelled out in rules or regulations, agencies must have the discretion to carry out their judicial function and decide issues at hand. *Id.* at 292, 94 S.Ct. at 1771 (citing *Chenery,* 332 U.S. at 201, 67 S.Ct. at 1580).

■ Based on the foregoing analysis, we conclude that even if it were a legislative-type decision, Becker County had the discretion, in an adjudicatory proceeding, to consider a pending CUP application under the ordinance in effect when that application was properly filed, rather than an amended version of the ordinance becoming effective after the application was filed. We further conclude that the deferential standard of review applicable to legislative-type determinations should be used.

## C. Vested Rights and Estoppel Rights

ELA claims that the county is required to apply the new 2005 section 7A of the zoning ordinance in considering the Jacobs' CUP application unless the Jacobs had acquired vested rights or estoppel rights under the 2002 version of the ordinance that was in effect at the time of their application. This argument is based on court decisions that have considered challenges to a municipality's application of a new, more restrictive land-use regulation to deny pending permits. Courts have developed a general rule that, in limited circumstances, landowners can invoke the legal principles of vested rights and estoppel to preclude application of the new, more stringent rules. *See, e.g., Yeh v. County of Cass,* 696 N.W.2d 115, 131 (Minn.App.2005) (analyzing the vested-rights and estoppel doctrines), *review denied* (Minn. Aug. 16, 2005). ELA's claim is that vested rights and estoppel repre-

sent the outer limits on the county's discretion to apply the earlier 2002 ordinance.

### 1. Vested Rights

 In a vested-rights analysis, courts ask whether a developer has progressed sufficiently with construction or otherwise to acquire a vested right in completing the project under the prior land-use regulations. *Yeh,* 696 N.W.2d at 131–32. The vested-rights doctrine exists to protect landowners from unfair changes in zoning laws targeted at stopping partially completed development. *Id.; see also Naegele Outdoor Adver. Co. of Minneapolis v. City of Lakeville,* 532 N.W.2d 249, 254 (Minn.App.1995) (holding that, when appellant did not submit permit application until four years after the ordinance in question was amended, appellant had no vested rights), *review denied* (Minn. July 20, 1995).

Here, the vested-rights doctrine would be applicable if the Jacobs had made substantial improvements based on a provisional CUP under the zoning ordinance prior to the amendment and the county had then denied the Jacobs's final application under the newly amended ordinance.[2] Because the county applied the 2002 ordinance and granted the CUP, the vested-rights analysis is not directly applicable in this case. We decline to accept ELA's assertion that the vested-rights principle has an inverse quality: that by implication it requires application of the new ordinance unless there are vested rights. Nothing in the vested-rights principle

gives it such a limiting affect on the county's discretion.

### 2. Estoppel

 The estoppel doctrine may be applied "where justice demands" in order to prevent a local government from inappropriately "exercising its zoning powers." *Yeh,* 696 N.W.2d at 131. Thus, "estoppel is available as a defense against the government if the government's wrongful conduct threatens to work a serious injustice and if the public's interest would not be unduly damaged by the imposition of estoppel." *Id.* (quotation omitted). "But if there is no wrongful conduct by the government, this court's inquiry should stop." *Id.* Because the county applied the 2002 ordinance and granted the CUP, it is not necessary for the Jacobs to defend their interests against government action, and the right of estoppel is inapplicable here.[3] If anything, the Jacobs may have had a claim that because of representations by county officials that the former ordinance would apply, the county was estopped from applying the provisions of the new 2005 section 7A to their application.[4]

### D. Conclusion

Based on the foregoing analysis, we conclude that neither the terms of the Becker County zoning ordinance, nor any limits on adjudicatory decision-making, nor the absence of vested rights, nor the inapplicability of estoppel precludes the county from granting the Jacobs a CUP based on the 2002 ordinance. We also observe that other governmental entities make deferred-

---

**2.** During the county's inquiry into the proper version of the ordinance to apply, the county attorney took a similar position.

**3.** We note that both estoppel and vested rights are designed to protect the landowner from unreasonable action by local government. It is not clear that ELA has standing to raise

those principles except in arguing by analogy to them.

**4.** We acknowledge that there is a question regarding how changes in Jacobs's application for a CUP affect that earlier commitment. *See* Section II.

effective-date determinations for substantive changes in the law. The legislature adopts laws with a future effective date. *See, e.g.,* 2005 Minn. Laws ch. 164, § 32 (making 2005 amendments to child support statutes effective January 1, 2007); 2006 Minn. Laws ch. 280, § 44 (clarifying effective date provision of 2005 Minn. Laws ch. 164, § 32). Similarly, the courts, even when addressing constitutional issues, occasionally rule on a question and state that the new principle only applies to matters arising after a certain date. *See Holmberg v. Holmberg,* 588 N.W.2d 720, 727 (Minn. 1999) (ruling that a portion of the then-existing administrative child support system was unconstitutional but delaying, for five months, the effect of the judgment with respect to other parties and cases). We are deferential to the county's authority to act prospectively. We conclude that Becker County has, as part of its quasi-judicial power, the authority to apply its then-existing zoning ordinance to CUP applications that were properly filed and pending when the ordinance was amended.

## II.

Having determined that a county has the authority to apply amendments to its zoning ordinance prospectively, we address the second issue: whether Becker County abused its discretion in doing so in this proceeding and granting the CUP to the Jacobs under the 2002 ordinance. A county's decision to grant or deny a CUP "will be upheld unless it was unreasonable, arbitrary, or capricious." *Sunrise Lake Ass'n, Inc. v. Chisago County Bd. of Comm'rs,* 633 N.W.2d 59, 61 (Minn.App.2001). We typically afford more deference to a decision granting a CUP than to a decision denying one. *Schwardt v. County of Watonwan,* 656 N.W.2d 383, 389 n. 4 (Minn.2003) (citing *Interstate Power Co. v. Nobles County Bd.*

*of Comm'rs,* 617 N.W.2d 566, 579 (Minn. 2000)).

ELA argues that the county acted arbitrarily or capriciously when it applied the 2002 version of the ordinance and granted the CUP. The record shows that, in its quasi-judicial proceedings, the county carefully considered which version of the ordinance to apply. The planning commission held a hearing on the issue, heard arguments from both sides, and debated the question. Ultimately, the commission determined that the then-existing version of the ordinance should apply because, as one member stated, "[T]he Board has usually used the ordinance that was in effect at the time of the application." The county board adopted this position.

Although it may have been preferable for the county to record this policy in the county's zoning ordinance, we have already concluded that the decision to follow the board's common practice was reasonably within the county's quasi-judicial function. Here, there is nothing in the record to indicate that this policy was applied inconsistently in other similar cases. Rather, the record indicates that the policy followed was consistent with the county's prevailing practices. Furthermore, as indicated above, the 2005 amendment of the ordinance contained no provision regarding its applicability to applications that were already under consideration.

ELA argues that the project could not have been governed by the 2002 ordinance because the project had been modified during the application process. Although the project had been changed from its original plan, these changes were apparently made in response to the county's environmental requirements. County representatives worked with the Jacobs as they changed their project to reduce the environmental impact. The changes provided for additional open space and new

locations for septic systems, and they relocated many RV sites away from the shoreline.

The county could have chosen to apply the amended 2005 version of the ordinance, but it was not required to do so. ELA concedes that the version of the ordinance that was in effect at the time of the application allowed as a conditional use the density for 46 sites, and perhaps up to about 70 sites, on the property owned by the Jacobs on Eagle Lake. Furthermore, in arguing that the Jacobs would have only been able to build a 29–site project under the amended ordinance, ELA implicitly concedes that even if the county had applied the amended 2005 version of the ordinance, it was still likely to grant the CUP and allow the project to go forward, albeit with fewer RV sites.

The record shows that the county was very familiar with the project. It conducted a lengthy public review of the Jacobs's project, and during its quasi-judicial hearings, gave careful consideration to whether the Jacobs's project complied with the 2002 version of the ordinance that was in effect at the time of the application. The county indicated that it had accepted the application and represented that the then-existing ordinance would apply, not the new ordinance that was under consideration. Becker County evaluated the project and the resulting impact it would have on the county and Eagle Lake. There is no indication in the record that this was a land-use proposal that the Jacobs rushed to file to avoid anticipated, protective environmental action. On this record, we conclude that Becker County did not abuse its discretion in granting the CUP according to the standards in the zoning ordinance in effect at the time that the Jacobs filed their application.

## III.

■ The third issue is whether the county erred in granting the CUP without requiring a site plan. ELA argues that the ordinance required the submission of a detailed site plan before the grant of any CUP. The 2002 ordinance that was in effect at the time of the Jacobs's application, required a "site plan and plat for the project showing," among other things, "existing and proposed structures and other facilities, land alterations, sewage treatment and water supply systems." Becker County, Minn., Zoning Ordinance § 7, subd. 3 (2002).

In reaching its final decision, the county had been reviewing a plan that provided for 54 RV sites. The county was familiar with the project and the modifications that had been made, including a more environmentally-sound layout. Although the Jacobs had initially proposed a 46–site project, several RV-site locations in the original plan were moved further from the lake as the number was increased to 54. When the project was scaled back to 46, the implication is that they were not at the same location as the original 46–site plan. When the county finally approved the project for 46 sites, the record did not include a determination of the specific layout for the final 46–site project. Because the final CUP does not contain a site plan for this final project, as required by the ordinance, we conclude that the county erred. We reverse the decision to grant the CUP and we remand to the county for consideration and action based on an actual site plan for the 46–site project.

## DECISION

Becker County had the authority to grant the CUP to the Jacobs pursuant to the 2002 county zoning ordinance which was in effect when the permit was submitted. But the county erred in acting with-

out an actual site plan for a 46–site RV campground. Accordingly, we reverse the grant of the CUP and remand for the submission of a site plan for a 46–site project and for county consideration and action on that plan.

**Affirmed in part, reversed in part, and remanded.**