*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0945**

Ralph A. Fredlund, et al.,
Appellants,

vs.

Eureka Township Board of Supervisors,
Respondent.

**Filed April 27, 2015
Reversed and remanded
Schellhas, Judge
Dissenting, Stauber, Judge**

Dakota County District Court
File No. 19HA-CV-13-3878

Paula A. Callies, Callies Law, P.L.L.C., Minneapolis, Minnesota (for appellants)

Paul D. Reuvers, Iverson Reuvers Condon, Bloomington, Minnesota (for respondent)

Considered and decided by Stauber, Presiding Judge; Schellhas, Judge; and Connolly, Judge.

## U N P U B L I S H E D   O P I N I O N

**SCHELLHAS**, Judge

Following appellants' action in district court, in which they disputed respondent's decision that keeping exotic animals on a farm for fur farming does not violate an ordinance prohibiting township residents from keeping such animals and sought a writ of mandamus to require the removal of such animals from property adjoining their

properties, appellants challenge the district court's summary judgment for respondent and the denial of their request for a writ of mandamus. Because we conclude that the district court erred as a matter of law in interpreting the town ordinances, we reverse the district court's summary judgment and denial of mandamus and remand to the district court.

## FACTS

Appellants Ralph Fredlund and William Funk own homes in a residential subdivision in Eureka Township. Their properties abut the property of Teresa Petter, who owns just over 57 acres of land that is zoned agricultural. Petter operates a fur farm on her property; she and Dan Storlie raise, breed, and skin fur-bearing animals and sell the pelts. The district court found that these animals include but are not necessarily limited to wolves, cougars, bobcats, otters, beavers, lynx, fishers, martens, and badgers. Appellants allege that, as adjoining property owners, they are disturbed by animal noises and odors and concerned about the safety risk posed by the exotic animals, and they cite a realtor's report that their property values could decrease by some 20% because of the risk posed by the exotic animals in the neighborhood.

Petter operates several businesses, including Wolves, Woods & Wildlife, a nonprofit corporation, formed in 2006 to educate the public about North American fur-bearing animals; Fur-Ever Wild Ltd., formed in 2011, through which Petter now operates the fur farm; and Fur-Ever Wild, a sole proprietorship, formed in 2012. Petter has held state game-farm licenses since 2006. She has registered her fur farm with the Minnesota Department of Agriculture since 2007. She also has a United States Department of

Agriculture (USDA) exhibitor's license. Storlie has a federal animal-control officer's license.

On June 7, 2005, respondent Eureka Township Board of Supervisors (board) adopted Eureka, Minn. Ordinance Code (EOC), including provisions that address agriculture and exotic animals. Under those provisions, commercial agriculture is permitted in the agricultural district in which Petter's farm is located. EOC 3, ch. 2, § 1(B)(1) (2013). The definition of "commercial agriculture" includes the use of land for the production of livestock products, which includes furs, and the definition of "agricultural operations" includes the raising of fur-bearing animals. EOC 1, ch. 4 (2013). But the definition of "livestock" explicitly excludes exotic animals. *Id.* And another ordinance prohibits owning, possessing, keeping, harboring, bringing, or having exotic animals within township limits, subject to certain exceptions, including exemptions for animal-control officers and for those who had exotic animals on or before the effective date of the ordinance. EOC 3, ch. 7, § 3(B), (C) (2013).

In 2006, when Petter sought a building permit to construct a building on her property to house her animals, the board became aware that Petter was keeping exotic animals.[1] At the time, Petter said that the exotic animals were fur-bearing North American wildlife—wolves, foxes, bobcats, lynx, and raccoons and noted that she had no mink, lions, tigers, or bears. Although the board discussed whether the keeping of these animals was a permitted use, the board took no action at the time.

---

[1] Although Petter has had a number of contacts with the board concerning various other ordinances, those are not at issue in this appeal and will not be addressed.

In August 2007, Petter and her fur farm were the subjects of a newspaper article that came to the board's attention. On September 14, 2007, the board asked Petter to provide a list of all exotic animals that were kept on the property as of the effective date of EOC 3, to verify that keeping such animals was a lawful conforming use. The board also asked Petter to list the species of each animal, provide the date each animal was first kept on the property, and furnish documentation to support her claim that the animals were kept on the property on or before June 7, 2005. In May 2008, Petter provided the board with an undated list of 15 types of animals, including wolves (and dogs), foxes, raccoons, lynx, bobcats, skunks, fishers, porcupines, beavers, coyotes, woodchucks, mink, badgers, wolverines, and otter, with the number of each type of animal ranging from a low of 2 to 10 otter, to a high of 90 to 1,200 foxes. Petter wrote that "[t]he numbers fluctuate from pre-breeding season to after-pelting season" and that she had no way to obtain an accurate count because it depended on whether they bred and the size of the litters.

At a July 2008 meeting, the board considered Petter's list, noting that the animals listed were not livestock and constituted general nonconforming use. At an August 2008 meeting, the board asked Petter for further information as to the use of the animals. At a September 2008 meeting, Petter told the board that she had the necessary federal permit and a fur-farm license from the Minnesota Department of Agriculture and explained that the Minnesota Department of Natural Resources (DNR) provides "site tags" when protected animals are skinned to verify that the animals are from a fur farm, rather than

being hunted in the wild.[2] After additional statements and discussions, the board concluded that Petter's operation was commercial agriculture, that a market existed for the furs produced, that furs are an agricultural product, and that the exotic-animal ordinance did not apply.

In December 2011, the Dakota County Sheriff's Department investigated a citizen's complaint about Petter's fur farm. In a meeting that month, the board also addressed a complaint regarding Petter's animals. The board concluded that the exotic-animal ordinance was preempted by Petter's state game-farm licenses, her state fur-farm license, and her USDA exhibitor's license and that, because of the game and fish laws, Petter was not keeping the animals illegally. Meanwhile, the sheriff's department found no violations at the fur farm.

At an April 2012 meeting, the board addressed concerns from a citizen about odor and noise from Petter's wolf operation and about whether the operation should be occurring on the property. Petter asserted that the DNR raised no concerns about odor during a recent inspection. The board cited the sheriff's report finding no violations and concluded that Petter was keeping the animals legally because the wolves are agricultural.

In March 2013, Eureka's planning commission considered Petter's proposed ordinance amendment to permit "agri-tourism," which, according to a member of the planning commission, would have allowed Petter to exhibit exotic animals in the township. Petter, who had sued the board in regard to exhibiting her animals, later

---

[2] Petter has held state game-farm licenses since 2006.

withdrew her application for an ordinance amendment, although the board considered taking up the amendment on its own. At an August 2013 meeting, the board addressed two citizen complaints about Petter's animals. In addition, appellants' attorney raised a complaint from several Eureka residents, including appellants, and asked the board to forward their complaint to its attorneys for criminal or civil action to enforce the exotic-animal ordinance as to Petter's property. A board member moved for the board to determine that the animals that Petter keeps on her property are within the exotic-animal ordinance. After much discussion about the applicability of the exception for animal-control officers, the board passed a motion recognizing "the animals on Terri Petter's farm as within[,i.e., compliant with,] the exotic animal ordinance," based on the past board decisions, past advice from attorneys, the sheriff's reports, and the ordinance. In effect, the board determined that the animals were exempt under the first exception to the exotic-animal ordinance for animal-control officers.

Appellants sued the board in 2013, asking the district court to determine that the board's decision was "arbitrary, capricious and unreasonable" because the board created for Petter an artificial and arbitrary exception from the exotic-animal ordinance. Appellants asked the court to issue a writ of mandamus to the board, requiring it to enforce the ordinance prohibiting township residents from keeping exotic animals and require the removal of exotic animals kept on Petter's property. The court concluded that the board "had a reasonable basis to determine that Petter's fur farm is a permitted use," granted summary judgment in favor of the board, and denied the request for a writ of mandamus. This appeal follows.

**D E C I S I O N**

**I.**

Appellants challenge both the district court's conclusion that the board's interpretation of the township ordinance is reasonable and the denial of appellants' request for a writ of mandamus. We first review the challenge to the reasonableness of the board's interpretation of the township ordinance. Appellants contend that the board's decision is arbitrary because the exotic-animal ordinance unambiguously makes it unlawful to keep exotic animals within Eureka township. The board contends that its decision is reasonable, is not arbitrary and capricious, and is supported by substantial evidence in the record.

This court reviews the "district court's grant of summary judgment de novo to determine whether any genuine issue of material fact exists and whether the district court erred in applying the law." *Larson v. Nw. Mut. Life Ins. Co.*, 855 N.W.2d 293, 299 (Minn. 2014). The interpretation of an ordinance is a question of law subject to de novo review. *Eagle Lake of Becker Cnty. Lake Ass'n v. Becker Cnty. Bd. of Comm'rs*, 738 N.W.2d 788, 792 (Minn. App. 2007).

Generally, "the proper procedure for reviewing a city's decision in a zoning matter" is a declaratory-judgment action, possibly along with a request for injunctive relief. *Mendota Golf, LLP v. City of Mendota Heights*, 708 N.W.2d 162, 178 (Minn. 2006). Here, although not explicitly designated as a declaratory-judgment action, appellants sought a declaration as to the proper interpretation of the pertinent ordinances. In reviewing a declaratory judgment that addresses a municipal-land-use decision, we use

a "rational basis standard of review," and the scope of review is narrow. *Id.* at 179−80. "We do not give any special deference to the conclusions of the lower courts, but rather engage in an independent examination of the record and arrive at our own conclusions as to the propriety of the city's decision." *Id.* at 180. The review "focuses on the legal sufficiency and factual basis for the reasons given." *Id.* (quotation omitted). "[W]hile issues of fact and legislative policy-making decisions should be left to the city's determination, subject only to the broad limits of the arbitrary and capricious standard, the interpretation of an existing ordinance is a question of law for the court." *Frank's Nursery Sales, Inc. v. City of Roseville*, 295 N.W.2d 604, 608 (Minn. 1980) (quotation omitted).

Under the rules of construction, courts should construe terms according to their plain and ordinary meaning. *Id.* "[Z]oning ordinances should be construed strictly against the city and in favor of the property owner" and must always be considered in light of their underlying policies. *Id.* at 608−09. "Certainly, the administrative interpretation of the ordinance is entitled to respect . . . ." *Id.* at 609. But this court must nonetheless determine whether the board was mistaken as to the applicable law. *Id.* at 608.

Other guidelines are helpful as well. "The word 'shall' is mandatory, and the word 'may' is permissive." EOC 1, ch. 1, § 2(C) (2013); *see* Minn. Stat. § 645.44, subds. 15, 16 (2014). "Whenever a word or term defined hereinafter appears in the text of these Ordinances, its meaning shall be construed as set forth in such definition. If no set definition is given in the Ordinances, the Board of Appeals shall interpret and define any word or section of the Ordinance." EOC 1, ch. 1, § 2(E) (2013). Finally, "[i]n the event of

conflicting provisions or laws, the more restrictive provisions or laws shall apply." EOC 1, ch. 1, § 2(G) (2013); *accord* Minn. Stat. § 645.26, subd. 1 (2014) (providing that if general provision conflicts irreconcilably with specific provision, more specific controls over more general, unless general provision is enacted at later legislative session and legislature's manifest intention is that general provision shall prevail); *see also R.L. Hexum & Assocs., Inc. v. Rochester Twp., Bd. of Supervisors*, 609 N.W.2d 271, 275 (Minn. App. 2000) (providing that if provisions of ordinance do not conflict, this cannon of construction is inapplicable).

We now turn to the ordinance. First, the ordinance recognizes rights of those engaged in commercial agriculture. EOC 3, ch. 5, § 1 (2013). The parties agree that Eureka ordinance 3, chapter 5, section 1, recognizes a "right to farm." And the agricultural district was established "for the purpose of protecting viable agricultural lands from non-farm influence; retaining valuable areas for conservation purposes; preventing scattered non-farm growth; and securing economy in governmental expenditures for public services, roads, utilities and schools." EOC 3, ch. 2, § 1(A) (2013). The plain language of the ordinance indisputably allows "[a]ny and all forms of commercial agriculture" as a permitted use in the agricultural district. EOC 3, ch. 2, § 1(B)(1). All farms in existence on the effective date of the ordinance "shall be a permitted use where the operator can conduct a farming operation." EOC 3, ch. 4, § 2 (2013). The definition of "commercial agriculture" includes the production of livestock products, which in turn includes "furs," as well as milk products, butter, cheese, eggs, and meat. EOC 1, ch. 4. Similarly, the definition of "agricultural operations" includes the

raising of "fur bearing animals." *Id.* But in the crucial language on which this issue rests, the plain language of the definition of "livestock" provides that it "includes but is not limited to: poultry, cattle, swine, sheep, goats, and horses, but *shall not include* Companion or *Exotic Animals*." *Id.* (emphasis added).

The board contends that, because of the ordinances and the testimony from Petter that she was operating a "fur farm" and that every one of her animals would be skinned, the board had a rational basis to determine that Petter's operation qualified as a permitted use, i.e., the production of fur. The board argues that it was entitled to weigh the credibility of Petter and evaluate the submissions of appellants' counsel. It further argues that its determination that Petter was compliant with the ordinance was reasonable and supported by substantial evidence in the record.

Appellants contend that the plain language of the definition of "livestock," which specifically excludes exotic animals, leads to only one possible conclusion from reading the ordinance provisions together—that exotic animals are not allowed as commercial agriculture in the township. The board acknowledges this language but points out that the ordinance also expressly allows as a permitted use the production of fur but does not define the term "fur bearing animals" or "fur," making it reasonable for the board to interpret the ordinance in favor of the landowner.

First, we address the fact that the ordinance provides that the raising of fur-bearing animals is a permitted agricultural operation and that the production of livestock products, which include furs, is permitted commercial agriculture. These provisions seemingly conflict with the provision that livestock "shall not include [e]xotic [a]nimals,"

at least to the extent that "exotic animals" are raised for purposes of producing fur, a purpose explicitly included in the definition of "commercial agriculture." The former are general provisions, and the latter is a more restrictive, specific provision. "In the event of conflicting provisions or laws, the more restrictive provisions or laws shall apply." EOC 1, ch. 1, § 2(G); *accord* Minn. Stat. § 645.26, subd. 1. In addition, the use of the term "shall not" means that this exclusion is mandatory, not permissive. *See* EOC 1, ch. 1, § 2(C); *see also* Minn. Stat. § 645.44, subd. 16. The more specific language prohibiting exotic animals from the definition of livestock therefore prevails. Accordingly, permitted livestock products do not include the fur of exotic animals.

Next, the fact that Petter has registered her fur farm with the state and is in compliance with her state game-farm licenses is irrelevant to determining whether she is violating local ordinances. Although at one point the board determined that the state law on licenses preempted the local ordinance, the board makes no showing or argument in this court that this local ordinance is preempted. *See Mangold Midwest Co. v. Vill. of Richfield*, 274 Minn. 347, 352, 143 N.W.2d 813, 816−17 (1966) (addressing when state statute preempts local ordinance). Nor has the board made any showing that any other state law would preclude the enforcement of the local ordinances as to Petter.

Moreover, if the ordinance were interpreted in such a way as to allow a "right to farm" the fur of exotic animals, the language that excludes exotic animals from the definition of livestock would be meaningless. *See* EOC 1, ch. 4. In addition to the provision that livestock does not include exotic animals is the general prohibition against

keeping exotic animals in the township. EOC 3, ch. 7, § 3(B)(1). "Exotic animals" are

defined as:

> Any animal that is not normally domesticated in the United States or is wild by nature. Exotic animals include, but are not limited to, any of the following orders and families, whether bred in the wild or captivity, and also any of their hybrids with domestic species. The animals listed in parentheses are intended to act as examples and are not [to] be construed as an exhaustive list or limit the generality of each group of animals, unless otherwise specified:
>
> A.  Non-human primates and prosimians (monkeys, chimpanzees, baboons)
> B.  Felidae (lions, tigers, bobcats, cougars, leopards, jaguars, not domesticated cats)
> C.  Canidae (wolves, coyotes, foxes, jackals, not domesticated dogs)
> D.  Ursidae (all bears)
> E.  Repitilia (all venomous snakes, all constricting snakes, iguanas, turtles, lizards)
> F.  Crocodilia (alligators, crocodiles)
> G.  Proboscidae (elephants)
> H.  Hyanenidae (hyenas)
> I.  Artiodactyla (hippopotamuses, giraffes, camels, not cattle or swine or sheep or goats)
> J.  Procyonidae (raccoons, coatis)
> K.  Marsupialia (kangaroos or possums)
> L.  Perissodactylea (rhinoceroses, tapirs, not horses or donkeys or mules)
> M.  Edentata (anteaters, sloths, armadillos)
> N.  Viverridae (mongooses, civets, genets)

EOC 1, ch. 4.

"It shall be unlawful for any person to own, possess, keep, harbor, bring, or have

in one's possession an exotic animal within Township limits." EOC 3, ch. 7, § 3(B)(1).

> It shall be unlawful for the owner, possessor, or any other person in control of a lot, tract, or parcel of land within the Township or any residence or business premises situated

thereon to knowingly permit any other person to be in possession of an exotic animal or exotic animals upon the property, residence or premises.

EOC 3, ch. 7, § 3(B)(2). These provisions are subject to several exceptions, including exemptions for animal-control officers and for those grandfathered. *See* EOC 3, ch. 7, § 3(C).[3]

Moreover, the board unmistakably set out its intent in adopting this ordinance:

It is the intent of the Town Board of the Township of Eureka to protect the public against the health and safety risks that exotic animals pose to the community and to protect the welfare of individual animals that are held in private possession. By their very nature, exotic animals are wild and potentially dangerous and, as such, do not adjust well to a captive environment.

EOC 3, ch. 7, § 3(A) (2013).

Under the plain language of the ordinance, and in light of the canons that the more specific provision prevails, exotic animals are not permitted to be used as livestock and, consequently, cannot be used for purposes of livestock products, unless an exception to the exotic-animal ordinance applies. We therefore reverse the district court's decision to the contrary as a matter of law.

## II.

Appellants assert that they are entitled to a writ of mandamus directing the board to initiate civil or criminal proceedings to prosecute Petter's possession of exotic animals in the township, and they challenge the district court's denial of their request. The board

---

[3] An argument might be made that these exceptions allow Petter to continue fur farming, subject to the limitations of the exceptions, but we do not reach that issue here. We address the exceptions in detail in our analysis of mandamus.

contends that the court should be affirmed because the standards for mandamus to issue have not been met.

"Mandamus is an extraordinary legal remedy." *Mendota Golf*, 708 N.W.2d at 171 (quotation omitted). Mandamus is used "(1) to compel the performance of an official duty clearly imposed by law and (2) to compel the exercise of discretion when that exercise is required by law." *Id.*; *see* Minn. Stat. § 586.01 (2014). "[B]ut it shall not issue in any case where there is a plain, speedy, and adequate remedy in the ordinary course of law." Minn. Stat. § 586.02 (2014). In mandamus actions, courts generally agree that a petitioner "must demonstrate a clear legal right to have the act in question performed and must demonstrate every material fact necessary to show the existence of the plain duty to act with respect to the relief sought." *Mendota Golf*, 708 N.W.2d at 174, 178–79 (quotation omitted) (holding that presence of alternating ways to resolve conflict between comprehensive plan and zoning ordinance indicated city had no clear duty to act in specific way ordered by district court).

In *Mendota Golf*, the supreme court provided guidance on the circumstances in which seeking mandamus in municipal zoning matters would be appropriate, stating that "these cases typically involve claims that a city failed to perform a clearly defined duty that is required by a statute or zoning ordinance." *Id.* at 178. As examples, the court cited cases in which the city failed to comply with a statutory requirement to mail notice concerning an amendment to the zoning ordinance or failed to grant or deny a building permit within the statutory time period. *Id.*

"When a decision on a writ of mandamus is based solely on a legal determination, we review that decision de novo." *Breza v. City of Minnetrista*, 725 N.W.2d 106, 110 (Minn. 2006). Statutory construction that may be necessary to review a mandamus decision is also subject to de novo review. *Id.* If disputed facts exist, the parties are entitled to have the issues tried before a jury. Minn. Stat. § 586.12 (2014). But if no factual dispute exists, no right to a jury trial exists. *Coyle v. City of Delano*, 526 N.W.2d 205, 208 (Minn. App. 1995).

Appellants contend that they established in district court the three requisite elements required to obtain mandamus relief: "(1) the failure of an official to perform a duty clearly imposed by law; (2) a public wrong specifically injurious to petitioner; and (3) no other adequate [legal] remedy." *See Kramer v. Otter Tail Cnty. Bd. of Comm'rs*, 647 N.W.2d 23, 26 (Minn. App. 2002). They argue that the board had a clear duty to stop the violation of its exotic-animal ordinance and to prevent future violations. And they contend that the exotic-animal ordinance unambiguously prohibits the keeping of exotic animals in the township, unless one of the exceptions stated in the ordinance is met, which they argue was not shown here. *See* EOC 3, ch. 7, § 3 (2013). Mandamus is the appropriate remedy here, they assert, because the board has a clear duty imposed by ordinance to "institute appropriate actions or proceedings to prevent, restrain, correct, or abate" violations or threatened violations of the township ordinance. EOC 8, ch. 1 (2013). The board argues that "previous boards came to the same conclusion [that] Petter was not violating the exotic animal ordinance" and that it "properly exercised its authority when it determined there was no violation." The board cites the district court's ruling that the

board "has acted within its authority and performed its duty regarding investigating and responding to the complaints and alleged ordinance violations." In light of our determination that exotic animals are prohibited, absent applicability of an exception, the issue of mandamus must be addressed.

Although the ordinance bans exotic animals, several exceptions exist, including exemptions for animal-control officers and for those grandfathered in when the ordinance was adopted. EOC 3, ch. 7, § 3(C). The district court did not address whether these exceptions apply. But due to our ruling that the exotic-animal prohibition applies to fur farming, the issue of the exceptions must be determined. First, relying in part on the exception for animal-control officers because Storlie has a federal license as an animal-control officer, the board ruled that Petter's animals were within the meaning of the exotic-animal ordinance. *See* EOC 3, ch. 7, § 3(C)(1). But "animal control officer" is defined as "an officer employed by or under contract with an agency of the state, county, municipality, or other governmental subdivision of the state which is responsible for animal control operations in its jurisdiction." Minn. Stat. § 343.20, subd. 5 (2014). Storlie undisputedly does not work as an animal-control officer for the township and the township undisputedly does not employ any animal-control officers. This exception therefore does not apply as a matter of law.

The second exception is for a person keeping exotic animals who has been grandfathered in:

> Any person who owned, possessed, kept or harbored exotic animal(s) on or before the effective date of this Ordinance, provided that all federal, state, and local licensing

and/or approval requirements are met. Any person who falls within this paragraph shall be permitted to hold, keep, harbor or maintain the number of exotic animals that person was legally permitted to hold, keep, harbor or maintain as of the date of adoption of this ordinance but shall not be permitted to increase the number of exotic animals held, kept, harbored or maintained within the Township.

EOC 3, ch. 7, § 3(C)(4). Although appellants argue that no evidence exists to show that Petter kept animals prior to the adoption of the ordinance, the board contends that the evidence shows the contrary. This is a disputed question of fact that must be determined before reaching a decision of whether mandamus should issue.

Next, appellants contend that the board's refusal to enforce the exotic-animal ordinance with regard to Petter is a public wrong specifically injurious to appellants. They cite the town's public duty to protect the community from inherently dangerous animals, as expressed by the intent of the exotic-animal ordinance. *See* EOC 3, ch. 7, § 3(A). They submitted affidavits in support of their claim that the market value of their homes has been diminished by the presence of the exotic animals, that they are disturbed by the animal noises and odors, and that they are concerned about their safety. Moreover, they contend that the board is knowingly allowing Petter to expand her operations and increase the dangers to appellants and others by the ever-growing numbers of exotic animals on her property. The district court did not address this issue and we cannot do so for the first time on appeal.

The district court concluded that appellants had other legal remedies available to them, without specifying the available legal remedies. But mandamus is the proper remedy if appellants can demonstrate that the board failed to perform a duty mandated by

the ordinance and no other legal remedy is available.  Consequently, we remand for the district court to rule on appellants' request for mandamus because, as a matter of law, under the plain language of the ordinance, exotic animals are not permitted to be used as livestock or livestock products.

**Reversed and remanded.**

**STAUBER**, Judge

I respectfully dissent.

"Mandamus is an extraordinary legal remedy. . . . The two primary uses of mandamus are (1) to compel the performance of an official duty clearly imposed by law and (2) to compel the exercise of discretion when that exercise is required by law. However, a writ of mandamus does not control the particular manner in which a duty is to be performed and does not dictate how discretion is to be exercised." *Mendota Golf v. City of Mendota Hgts.*, 708 N.W.2d 162, 171 (Minn. 2006) (quotations and citations omitted).

This court can quibble about what type of decision the Eureka Township Board was making, but as the record demonstrates, the board, over a number of years, was asked to determine whether the Eureka Township Zoning Ordinances prohibited Teresa Petter from running a fur farming operation based on exotic animals. The board reviewed complaints and heard testimony from Petter, her associate, and appellants; collected information from the sheriff's department and the DNR; and listened to the arguments of appellants' attorney and the advice of its attorney. This "hearing" occurred over the course of several years and did not include the trappings of a formal trial, but to my eyes, the board received and weighed evidence and exercised its discretion. "[M]andamus is not appropriate to review the exercise of legislative discretion in municipal zoning matters." *Id.* at 179.

As the majority acknowledges, several principles are used in construing an ordinance: zoning ordinances are construed in favor of a property owner, the underlying

D-1

policy must be considered, and administrative interpretation of an ordinance is entitled to respect. *Frank's Nursery Sales, Inc. v. City of Roseville*, 295 N.W.2d 604, 608-09 (Minn. 1980). Finally, "even if the city council's decision is debatable, so long as there is a rational basis for what it does, the courts do not interfere." *Mendota Golf*, 706 N.W.2d at 180 (quotation omitted).

The board carefully considered the application of this ordinance over a number of years. It heard testimony and concluded that Petter was credible when she stated that she was engaged in fur farming and she pelted every animal she raised. It considered the clear directive in its ordinances that Eureka Township was an agricultural community and that commercial agriculture was a permitted use. It took action against Petter when she sought to exhibit exotic animals as a form of agritourism but concluded that raising exotic animals for the purpose of pelting and selling a recognized agricultural product brought her within compliance of the exotic animal ordinance, which seeks to prevent the raising exotic animals for the mere purpose of having them. While we individually may take issue with this conclusion, it provides a rational basis for the board's decision.

The majority argues that the more specific prohibition against exotic animals must carry more weight than the less specific commercial agriculture sections. But an ordinance is construed as a whole "so as to harmonize and give effect to all its parts." *Id.* at 128 (quotations and citations omitted). And, although "the specific must govern the general" when interpreting statutes or ordinances, in actual fact the rules of construction instruct that "[w]hen a general provision of law is in conflict with a special provision in the same or another law, the two shall be construed, if possible, so that effect may be

given to both." Minn. Stat. § 645.26, subd. 1 (2014). Guided by this rule of construction, the board observed that its ordinances (1) "protect[ ] viable agricultural lands from non-farm influence;" Ord. 3, Ch. 2, § 1(A); and (2) permit "[a]ny and all forms of commercial agriculture;" Ord. 3, Ch. 2, § 1(B); and that (3) "commercial agriculture" includes raising certain livestock products, including "furs"; (4) "[l]ivestock is defined as "[a]ny animal used by person for draft or pleasure purposes" and does not include companion or exotic animals but livestock products are not similarly limited; (5) "exotic animal" is defined to include many of the animals Petter kept on her fur farm; (6) it is unlawful to "own, possess, keep, harbor, bring, or have in one's possession an exotic animal within Township limits"; Ord. 3, ch. 7, § 3(B); and (7) Petter testified that she raised the animals for their fur and pelted all of the animals.

The board reconciled these seemingly conflicting provisions by determining that Petter was engaged in a legitimate commercial agricultural operation and that she did not keep exotic animals to simply have them but to raise, harvest, and sell pelts as an agricultural product. The board was guided by the underlying policy of the entire zoning code: the township is considered to be an agricultural district, they are instructed to protect viable agricultural lands from non-farm influence, and commercial agriculture is not only a permitted use, but an encouraged use.

Based on this, the district court's conclusion that the board reasonably interpreted its ordinances is not erroneous. If the board's interpretation is reasonable, then appellant's petition for a writ of mandamus was properly denied: mandamus lies only to

enforce an official duty clearly imposed by law. *Breza v. City of Minnetrista*, 725 N.W.2d 106, 109-110 (Minn. 2006). I would affirm the district court.